# 23-6598-cr

## United States Court of Appeals

### *for the*

### Second Circuit

———————◆———————

UNITED STATES OF AMERICA,

*Appellee,*

— v. —

ALEXEI SAAB, AKA Ali Hassan Saab, AKA Alex Saab, AKA Rachid,

*Defendant-Appellant.*

———————————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR DEFENDANT-APPELLANT

MATTHEW W. BRISSENDEN, P.C.
*Attorneys for Defendant-Appellant*
666 Old Country Road, Suite 501
Garden City, New York 11530
(516) 683-8500

CP COUNSEL PRESS    (800) 4-APPEAL • (331188)

## TABLE OF CONTENTS

STATEMENT OF JURISDICTION……………………………………….1

PRELIMINARY STATEMENT……………………………………….…1

ISSUES PRESENTED…………………………………………………..2

STATEMENT OF FACTS…………………………………………………4

SUMMARY OF ARGUMENT……………………………………… 23

ARGUMENT…………………………………………………………… 24

POINT I: THE DEFENDANT'S ALLEGED RECEIPT OF
MILITARY-TYPE TRAINING OCCURRED OUTSIDE
THE APPLICABLE STATUTE OF LIMITATIONS……………… 24

    A.    There Was No Legal Basis to Apply an
Extended Statute of Limitations Which Only
Came into Existence After-the-Fact………………..25

    B.    Alternatively, if 18 U.S.C. § 3286 *Does* Apply,
the Jury Should Have Been Instructed That It
Needed to Find a Foreseeable Risk of Death
or Serious Injury *After* December 4, 2004………... 31

    C.    The Evidence Was Legally Insufficient to
Establish That Mr. Saab's Alleged Receipt of
Military-Type Training Created a Foreseeable
Risk of Death or Serious Injury…………………... 33

POINT II: THE FAILURE TO PROPERLY CHARGE THE JURY ON
THE NEED TO FIND POST-ENACTMENT CONDUCT
VIOLATED THE DEFENDANT'S DUE PROCESS
RIGHTS AND CONSTITUTED PLAIN ERROR……………….. 36

    A.    Applicable Law………………………………… 36

    B.    Discussion……………………………………… 39

i

POINT III.  THE LOWER COURT COMMITTED PROCEDURAL
SENTENCING ERROR WHEN IT ENHANCED THE
DEFENDANT'S OFFENSE LEVEL UNDER
U.S.S.G. § 3A1.4, BECAUSE 18 U.S.C. § 2339D
DID NOT BECOME "A FEDERAL CRIME OF
TERRORISM" UNTIL MARCH OF 2006……………………...42

CONCLUSION…………………………………………………………45

## <u>TABLE OF AUTHORITIES</u>

*Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 109 S. Ct. 468 (1988)................26

*Calder v. Bull*, 3 U.S. (3 Dall.) 386 (1798)..................................................43

*Collins v. Youngblood*, 497 U.S. 37, 110 S. Ct. 2715 (1990)..................................30

*Hughes Aircraft Co. v. United States ex rel. Schumer*,
520 U.S. 939, 117 S. Ct. 1871 (1997)....................................................28

*Landgraf v. Usi Film Prods.*, 511 U.S. 244, 114 S. Ct. 1483 (1994)............26, 28, 20

*Lynce v. Mathis*, 519 U.S. 433, 117 S. Ct. 891 (1997)......................................29, 43

*Peugh v. United States*, 569 U.S. 530, 133 S. Ct. 2072 (2013)..........................29, 43

*Snowden v. Lexmark Int'l, Inc.*, 237 F.3d 620 (6th Cir. 2001)..................................30

*Toussie v. United States*, 397 U.S. 112 (1970)..............................................41

*United States v. Anderson*, 61 F.3d 1290 (7th Cir. 1995)........................................44

*United States v. Chea*, 231 F.3d 531 (9th Cir. 2000)..........................................44

*United States v. Comstock*, 154 F.3d 845 (8th Cir. 1998)........................................44

*United States v. Davis*, 397 F.3d 340 (6th Cir. 2005)..............................................44

*United States v. Fuchs*, 218 F.3d 957 (9th Cir. 2000)..............................................31

*United States v. Hassoun*, No. 04-60001-CR,
2007 U.S. Dist. LEXIS 85684 (S.D. Fla. Nov. 20, 2007)..........................41

*United States v. Keigue,* 318 F.3d 437 (2d Cir. 2003)..........................................44

*United States v. Keller*, 58 F.3d 884 (2d Cir. 1995)..........................................44

*United States v. Marcus*,
560 U.S. 258, 130 S. Ct. 2159 (2010)......................36, 37, 38, 39, 40, 41

iii

*United States v. Nichols*, 169 F.3d 1255 (10th Cir. 1999)...................................29, 43

*United States v. Orr*, 68 F.3d 1247 (10th Cir. 1995)...................................................44

*United States v. Syme*, 276 F.3d 131 (3d Cir. 2002)...................................................44

*United States v. Torres*, 901 F.2d 205 (2d Cir. 1990)................................................37

*United States v. Tykarsky*, 446 F.3d 458 (3d Cir. 2006)...........................................39

## STATEMENT OF JURISDICTION

Defendant-Appellant Alexei Saab appeals from a judgment of conviction entered in the United States District Court for the Southern District of New York. Mr. Saab was convicted, after trial, of Receiving Military-Type Training from a Terrorist Organization (18 U.S.C. § 2339D), Conspiracy to Commit Marriage Fraud (18 U.S.C. §§ 371, 1325[c]), and False Statements (18 U.S.C. § 1001). Sentence was imposed by the Honorable Paul G. Gardephe on May 25, 2023, and Judgment was entered on June 5, 2023. On that same day, the Defendant filed a timely Notice of Appeal. This Court has jurisdiction pursuant to Title 28 U.S.C. § 1291.

## PRELIMINARY STATEMENT

Alexei Saab was convicted of Receiving Military-Type Training from a Terrorist Organization (18 U.S.C. § 2339D), based upon his alleged involvement with Hizballah between 1996 and the spring of 2005. Although such conduct allegedly ended fifteen years prior to the issuance of the indictment, the Government argued that the statute of limitations had not run, because, it alleged, the receipt of such training "created a foreseeable risk of death or serious bodily injury," so as to extend the period of limitations indefinitely under 18 U.S.C. § 3286.

But the criminal statute used to prosecute Mr. Saab did not even *exist* for the vast majority of the charged period. 18 U.S.C. § 2339D was enacted on December 17, 2004, only months before Mr. Saab's alleged affiliation with Hizballah ceased

altogether.[1]  Moreover, at the time of its enactment, it § 2339D was subject to a mere five-year statute of limitations; indeed, the extended statute of limitations under § 3286 did become applicable until March of 2006, when § 2339D was designated as a "federal crime of terrorism."

The jury in this case was never informed of § 2339D's statutory date of enactment.  It was not required to find that the Defendant received training *after* December 17, 2004.  Nor was it required to find that such training created a foreseeable risk of death or serious bodily injury *after* the date of enactment.  To the contrary, in summation, the Government argued that Mr. Saab could be convicted based on training allegedly received as early as 1999.  Prosecutors further argued that the Defendant's conduct in 1998 and 2003 created a foreseeable risk of death or injury sufficient to extend the statute of limitations, for an offense that was not even in existence at the time.

## ISSUES PRESENTED

In light of the above factual background, the instant appeal presents the following questions:

---

[1]      At trial, the Government stipulated that Mr. Saab ceased his affiliation with Hizballah in the spring of 2005.  *See* GX 1003.

1) Did the lower court commit plain error in failing to instruct the jury that the Defendant's conviction could not rest upon conduct occurring prior to the date of statutory enactment?

2) Did the lower court commit plain error in applying 18 U.S.C. § 3286's extended statute of limitations, as opposed to the five-year statute of limitations in effect at the time of the alleged offense?

3) Alternatively, did the lower court commit plain error in failing to instruct the jury that, in order to extend the statute of limitations under § 3286, the Government was required to prove that the Defendant's receipt of military-type training created a foreseeable risk of death or serious injury *after* December 17, 2004?

4) Was the evidence legally sufficient to establish that the Defendant's receipt of military-type training created a foreseeable risk of death or serious injury?

5) Did the lower court commit procedural error at sentencing by including a twelve-level enhancement under U.S.S.G. § 3A1.4, where the offense of conviction was not designated as "a federal crime of terrorism" until March of 2006?

## STATEMENT OF FACTS

### I. DEFENDANT'S BACKGROUND

Alexei Saab was born in January of 1977 in Yaroun, Lebanon, a small town near the southern border of the country. TR 45; 596 (A-120; A-658).[2] In 1982, when Mr. Saab was five years old, southern Lebanon was invaded and occupied by Israel, in response to cross-border attacks that were being carried out by the PLO from Lebanese territory. TR 927-931 (A-989 to A-993). Israel remained in control of the area through 2000; as a result, Yaroun was militarily occupied throughout Mr. Saab's childhood. TR 444 (A-506).

The Defendant attended the University of Lebanon in Beirut from 1996 to 1999; upon graduation, at age twenty-three, he traveled to the United States, where he was admitted as a lawful permanent resident. *See* GX 1005 (A-1479).

Over the next nineteen years, Mr. Saab lived in the United States, returning periodically to visit Lebanon. He found employment in the information technology field, while also obtaining two master's degrees. Sentencing Transcript at p. 48 (A-1683). The Defendant became a United States Citizen in 2008. TR 327 (A-389). In 2012, he married a woman from France, and several years later, in 2015, the couple filed a petition for her to obtain permanent residency.

---

[2] Citations to the trial transcript are designated as "TR-##." Corresponding citations to the Defendant's Appendix are designated as "A-##."

## II.   INVESTIGATION AND ARREST

In 2019, Alexei Saab was 42 years old and living in New Jersey, where he worked in the IT department of an industrial waste management company and as an adjunct professor at a local college.  TR 521 (A-583).

On March 14, 2019, he was approached by two FBI agents outside of his apartment building in Morristown, New Jersey; Mr. Saab, at the agent's request, accompanied them to an office space in an adjacent building for questioning.  TR 191-193 (A-252 to A 255).  During that meeting, Mr. Saab answered questions about his interactions with Hizballah dating from 1996 through early 2005, when he ceased association with that organization.  TR 207 (A-269).

Separate and apart from his history with Hizballah, Mr. Saab also admitted entering into a fraudulent marriage with a French woman named Nadia Haddani, in exchange for $20,000.  As of 2019, Ms. Haddani had not obtained United States citizenship.  TR 215 (A-277).

At the end of that first meeting, Mr. Saab was informed that the agents had obtained a search warrant for his apartment; the Defendant furnished the agents with a key and remained with them while the search was being carried out.  TR 219 (A-281).

Mr. Saab met with agents on ten additional occasions between March 14, 2019 and June 20, 2019, without the presence of counsel.  During those meetings, he

5

allegedly described how, as a young man in college, he had been recruited by Hizballah. He allegedly told agents that he initially performed tasks for the organization inside of Lebanon, before moving to the United States in 2000, at which point he commenced training with its External Security Operations ("ESO") section. According to the Government, Mr. Saab detailed the training that he had received relating to small arms, surveillance, and explosives. TR 188-189 (A-250 to A-251). He allegedly told agents about specific operations he had undertaken in Lebanon, which included planting a roadside bomb in 1998, and the attempted assassination of an Israeli spy in 2003. TR 189-190 (A-251 to A-252). Finally, Mr. Saab allegedly detailed his activities in the United States from 2000 through 2004, involving the surveillance and photography of infrastructure and potential targets inside this county. TR 190 (A-252).

In July of 2019, Mr. Saab was arrested pursuant to a criminal complaint charging him with terrorism-related and immigration offenses. ECF 1 (A-37). Following his arrest, Mr. Saab met with the Government on three additional occasions, accompanied by counsel. TR 407-433 (A-469 to A-495). On September 19, 2019, the Government filed an indictment. As relevant for purposes of this appeal, the indictment charged Mr. Saab with the following counts[3]: **(1)** Conspiracy

---

[3]     Mr. Saab was also initially charged with Conspiracy to Receive Military-Type Training from Hizballah (18 U.S.C. §§ 371, 2339D) and Unlawful Procurement of

to Provide Material Support to Hizballah (18 U.S.C. § 2339B); **(2)** Provision of Material Support to Hizballah (18 U.S.C. § 2339B); **(3)** Receipt of Military-Type Training from Hizballah (18 U.S.C. § 2339D); **(4)** Marriage Fraud Conspiracy (18 U.S.C. § 1325[c]); **(5)** Citizenship Application Fraud (18 U.S.C. § 1546[a]); **(6)** Naturalization Fraud (18 U.S.C. § 1015[a]); **(7)** False Statements (18 U.S.C. § 1001). ECF 6 (A-70).

## III.  TRIAL

Mr. Saab's case proceeded to trial on April 25, 2022, before the Honorable Paul G. Gardephe.  The evidence and arguments adduced by the Government and Defense are summarized below.

### A.  Government Case

The Government called eleven witnesses.  Its primary witnesses included FBI Agent Jacquline Smith, who executed the search warrant at the Defendant's home; Forensic IT Specialist Craig Roth, who testified about images and videos obtained from a hard drive recovered from the Defendant's apartment;  FBI Agent Anthony Cipriano, who testified about the statements made by the Defendant over the course of his fourteen interviews; Dr. Matthew Levitt, who testified about the history and

---

Citizenship to Facilitate an Act of Terrorism (18 U.S.C. § 1425[a]).  On December 24, 2021, the Government elected not to proceed on such counts.  ECF 148 (A-86). The numbering above reflects the counts that were presented to the jury.

practices of Hizballah; FBI Agent Brian Murtagh, who opined as to the potential viability of several bomb schematics drawn by the Defendant during his interviews with Agent Cipriano; Senior Immigration Service Officer Art Raevsky, who testified concerning immigration paperwork filed by the Defendant; and FBI Agent Greg McHugh, who interviewed the Defendant in April of 2005 at the JFK International Airport.

The testimony of these witnesses generally bore upon one of two subjects: (1) the Defendant's alleged involvement with Hizballah; and (2) the Defendant's alleged immigration fraud. That testimony is described in more detail below.

1.    *Evidence Relating to the Defendant's Involvement with Hizballah*

The heart of the Government's terrorism case was based upon the Defendant's own alleged statements – provided over the course of fourteen meetings – as relayed to the jury by Agent Cipriano. According to Agent Cipriano, Mr. Saab disclosed that he was first recruited by Hizballah in 1996, while he was a student studying at the University of Lebanon. TR 189 (A-251). Thereafter, between 1996 and 2000, he conducted surveillance of Israeli troop movements when he returned home to visit his family in southern Lebanon. TR 196; 478 (A-258; A-540). Mr. Saab told the Government that in approximately 1998, he and his brother were tasked with placing a roadside bomb ("IED") that was intended to target Israeli troops. TR 353 (A-415).

The Defendant told the agents that three weeks later, he learned that the device had detonated, injuring an Israeli officer. TR 385 (A-447).

Mr. Saab further relayed to the agents that in approximately 1999, he received weapons training, learning to use a pistol, automatic rifles, and hand grenades. TR 199-200; 469 (A-261 to A-262; A-531).

Thereafter, in 2000, Mr. Saab was assigned a new handler – a man whom he knew as "Wissam" – who commenced the Defendant's training for external security operations outside of Lebanon. TR 200 (A-262). Mr. Saab moved to the United States that same year, but returned to Lebanon frequently, meeting with Wissam for training 20 to 30 times between 2000 and 2004. TR 201 (A-263). In 2003, he began surveillance and counterintelligence training. TR 202 (A-264). Mr. Saab described being picked up by a van in Beirut, blindfolded, and taken with other recruits to a secure location for training. *Id*. That same year he also engaged in field exercises to hone his surveillance and counter-surveillance techniques. TR 285, 456, 459, 538 (A-347, A-518, A-521, A-600).

Mr. Saab described to agents how he put this training to use in the United States by surveilling and photographing potential targets, including bridges and public buildings. TR 262-268 (A-324 to A-330). The Government introduced a series of photographs located on Mr. Saab's hard drive which matched this description. *See, e.g*., GX 24, 25, 65, 70 (A-1428 to A-1431). However, the

Government adduced no evidence that such photos and videos had ever been delivered or transmitted to Hizballah or its agents.

In his fifth proffer session, Mr. Saab relayed to the agents an event that purportedly occurred in 2003, when he was in the midst of his ESO training. He described being instructed by his "field mentor" to steal a vehicle, deliver the vehicle to his mentor, and then await instructions at a designated safe house. TR 290 (A-352). Several days later, he was picked up by his mentor, driving the same vehicle, and taken to a field approximately 15 minutes away. TR 291 (A-353). As they were driving, Mr. Saab's mentor instructed him to retrieve a pistol with a silencer from under his seat. When they arrived at the field, there was a white van parked there; the mentor instructed Mr. Saab to approach the van and shoot the person inside. *Id*. According to the agent, Mr. Saab "described initially feeling like it was training, but then quickly realizing that it wasn't." Mr. Saab reported approaching the man in the van, and attempting to pull the trigger twice; the gun, however, did not fire, and Mr. Saab fled the scene with his field mentor. TR 292 (A-354). Mr. Saab stated that afterwards, he was "very shaken" and told his instructors they should never ask him to do something like that again. *Id*. He was later informed that the person in the van was "an Israeli spy." TR 293 (A-355).

According to Agent Cipriano, Mr. Saab also described receiving three weeks of explosives training "[i]n approximately 2004 and 2005." TR 204; 252 (A-266;

A-314). Such training took place in a safe house outside of Beirut, where Mr. Saab was purportedly taught to construct different types of IEDs. TR 205-206; 252-254 (A-267 to A-268; A-314 to A-316). At the agents' request, Mr. Saab drew diagrams of three such devices. TR 271; *see also* GX 301, 302, 303 (A-333; A-1436 to A-1438). Special Agent Brian Murtagh, a bomb technician with the FBI, testified that the diagrams depicted potentially viable explosive devices. TR 756-772 (A-818 to A-834).

Mr. Saab told agents that in December 2004 or January 2005, he was instructed to travel to Istanbul, where he surveilled several locations, including a religious facility, a palace, and street markets. TR 254-255 (A-316 to A-317). Photographs from this trip were located on Mr. Saab's hard drive and entered into evidence. *See, e.g.*, GX 114-117 (A-1432 to A-1435). Thereafter, Mr. Saab flew to Damascus, Syria, where he met his handler and drove across the border back into Lebanon. TR 260 (A-322).

In April of 2005, Mr. Saab left Lebanon, returning to the United States with a connecting stop in Istanbul. At the Istanbul airport, one of Mr. Saab's bags tested positive for explosive residue. TR 261; 207 (A-323; A-269). He was permitted to continue on his flight after being questioned by Turkish authorities. TR 207 (A-269). Upon arrival, however, he was questioned again at JFK International Airport, where he told his interviewer that he had gone hunting while in Lebanon. *Id*. The

11

Government called FBI Agent Greg McHugh, who had participated in the April 2005 interview, and who confirmed this account. TR 910-914 (A-972 to A-976).

After this event, Mr. Saab told his handler that he was uncomfortable continuing and would no longer assist Hizballah with its operations. TR 207 (A-269). The Government stipulated that Mr. Saab "ceased Hizballah-related operation activities in or about spring of 2005, and Hizballah terminated its relationship with the defendant in the spring of 2005 and no longer provided the defendant with any assignments, tasking, or training after the spring of 2005." TR 211; GX 1003 (A-273; A-1477).

### 2.   *Immigration Fraud Evidence*

In 2008, Alexei Saab became a United States citizen, and in 2012, he married a woman named Nadia Haddani. GX 401 (A-1439). The Government called Senior Immigration Services Officer Raevsky Sitko, who testified about immigration paperwork submitted by the Defendant and Ms. Haddani. In particular, in 2015, the couple filed an application for removal of conditions of residency, which if successful, would result in the issuance of a green card to Ms. Haddani. TR 806-808 (A-868 to A-870). On the application, Mr. Saab represented that no fee had been paid in connection with the petition, and that the marriage was not entered for the purpose of procuring immigration benefit. TR 825; GX 402F (A-887; A-1440).

In addition to Mr. Saab's admission to the contrary to Agent Cipriano, the Government also introduced a series of emails between Mr. Saab and a woman referred to at trial as "LJ." In those emails, Mr. Saab and LJ discussed, in sometimes anguished terms, their love for one another and his decision to enter into a "paper" marriage to pay off his debts, and for the benefit of LJ and her children. GX 413A-413E (A-1449 to A-1476).

### B. Defense Case

Counsel for Mr. Saab called Anthanasios Cambanis to testify as an expert regarding the history and methods of Hizballah. Mr. Cambanis testified regarding the Israeli occupation of Southern Lebanon from 1982 through 2000, and the internal political and sectarian divisions inside of Lebanon. TR 927-933 (A-989 to A-995). He testified regarding Hizballah's use of violence, including assassinations, against foes inside of Lebanon. TR 933-937 (A-995 to A-999). He testified that such assassinations were carried out exclusively through bomb attacks. TR 934 (A-996). Mr. Cambanis further testified that during the Israeli occupation, IED attacks against military convoys were tracked and documented by the United Nations and other entities. TR 938-940 (A-1000 to A-1002). He testified that he was unable to find any account of an IED attack in Yaroun between 1996 and 1998 which corresponded to the event described by the Defendant. TR 941 (A-1003).

13

Finally, defense counsel called Michele Bush, a computer forensics expert, who explained that the Defendant's imaged hard drive – Government Exhibit 357 – was an external storage drive containing much older data that was transferred as part of a mass back-up. TR 1047; 1049 (A-1109; A-1111). The incriminating material introduced by the Government amounted to only a tiny fraction of the more than 500,000 files located on the hard drive. TR 1046 (A-1108).

### C.    Rule 29 Motion

At the close of the trial, defense counsel moved for a judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure. Among other things, counsel argued that the Government had failed to prove that the Defendant's conduct fell within the statute of limitations set by 18 U.S.C. § 3286 (b). TR 1074 (A-1136). That statute provides an eight-year statute of limitations for designated terrorism offenses, unless the Government can prove that the offense conduct "created a foreseeable risk of death or serious bodily injury to another person," in which case the prosecution may be brought at any time. *See* 18 U.S.C. § 3286 (a), (b).

The Government argued, in response, that it had met its burden of proof in four ways: (1) through evidence that the Defendant conducted surveillance in southern Lebanon from 1996 through 2000; (2) with evidence that the Defendant participated in a 1998 IED attack; (3) by evidence of the Defendant's preoperational

surveillance activities within the United States from 2000 to 2004; and (4) through the evidence concerning Defendant's 2003 attempted assassination of an Israeli spy. TR 1076-1077 (A-1138 to A-1139).

When pressed specifically as to how the Defendant's receipt of *training* had created a foreseeable risk of death or injury on Count 3, the Government argued:

> He received training in, among other things, the creation and how to detonate explosive devices, the use of AK-47s, the use of M-16s, and then he came to the United States in part prepared to be, in his own words, a lone wolf operative, someone who was trained to carry out, if needed, a mission. So his receipt of things like military-type training in which he learned how to construct an explosive coupled with the tasking he received suffices to establish that the training created a . . . foreseeable risk of death or serious bodily injury to others.

TR 1078 (A-1140).

The court reserved decision. *Id.*

**D.    Summation**

*1.    Government Summation*

In summation, the Government argued that the Defendant had been a terrorist since "the late 1990s," who was "trained to scout, trained to prepare, and trained to execute if called upon." TR 1101-1102 (A-1163 to A-1164).

The Government then catalogued that training in detail, describing how, "[i]n 1999, he got trained in firearms – AK-47s, M16s, pistols, grenades. . . Weapons designed to cause serious bodily injury; weapons designed to kill; weapons

15

Hizballah trained the defendant to use." TR 1119 (A-1181). Prosecutors went on to describe how in late 2000, as the Defendant was preparing to move to the United States, he was transferred to a new handler, and "his training grew more intensive." TR 1120 (A-1182). The Government recounted a specific countersurveillance exercise that had purportedly taken place in 2003, and how Mr. Saab was transported to training sessions that same year. TR 1121 (A-1183). And finally, the Government talked about the bomb training Mr. Saab received "15 years" before his 2019 interview with the FBI. TR 1122 (A-1184). Specifically addressing the elements of 18 U.S.C. § 2339D, the Government told the jury:

> You heard all about the training he received, firearms, explosives. He learned so well how to plant and create bombs, and he was taught so extensively that he remembered 15 years after he left Hizballah. His training on weapons too, like the pistol training he had, which prepared him to try to assassinate the spy, *all of that counts*, all of that aligns with the defendant's goal and Hizballah's purposes in training him."

> TR 1149 (A-1211) (emphasis added).

As for the statute of limitations, the Government expressly told the jury that it could consider *all* of the Defendant's conduct – without temporal limitation – to determine whether the Defendant reasonably should have known that "the offense conduct create[ed] a foreseeable risk of death or serious bodily injury." TR 1151 (A-1213).

Once again, the Government argued that there were four specific incidents and/or actions which established such risk. First, the Government claimed that the

Defendant's surveillance of locations within the U.S. created a foreseeable risk of death or serious injury. TR 1152 (A-1214). Second, it argued that the Defendant's personal involvement in the alleged 1998 IED attack created a risk of death or injury. TR 1153-1154 (A-1215 to A-1216). Third, the Government argued that such risk was established by his alleged surveillance of Israeli troops between 1996 and 2000. TR 1154 (A-1216). And finally, the Government argued that the Defendant's attempted assassination of an Israeli spy in 2003 created a foreseeable risk of death and/or serious injury. TR 1155 (A-1217). Notably, none of these events took place after December of 2004, and none of them related *per se* to the Defendant's alleged receipt of military training.

The Government told the jury that the existence of such a foreseeable risk made the statute of limitations inapplicable under 18 U.S.C. § 3286 (b). As a consequence, prosecutors argued, the Defendant's 2005 decision to disassociate from Hizballah "d[id]n't matter."

> It does nothing to erase his guilt. It does nothing to erase his years of terrorism, his activity in this country, his activity abroad. Because what he did before can't be erased by anything that happened in the Spring of 2005 or anything that happened after.
>
> TR 1139 (A-1201).

2. *Defense Summation*

Defense counsel argued that the jury could not accept at face value the statements Mr. Saab made during his interviews. It argued that many of the details relayed during those proffer sessions – including the use of an ESO trainee to carry out an assassination with a firearm – were inconsistent with Hizballah's actual practices as established by expert testimony. TR 1166; 1173-1174 (A-1228; A-1235 to A-1236). Likewise, he argued that there was no documented report or corroborating evidence to support the Government's contention that the 1998 IED attack actually took place. TR 1175 (A-1237). And he argued that a person still undergoing training would never be sent to the United States to serve as a sleeper agent with the ESO. TR 1176 (A-1238).

## E.   Jury Charge and Verdict

The court charged the jury as to the elements of the applicable offenses, including Receipt of Military-Type Training from a Terrorist Organization, under 18 U.S.C. § 2339D. TR 1242-1245 (A-1304 to A-1307). The court further charged that, in order to overcome a statute of limitations defense, the Government was obligated to prove that the offense in question "created a foreseeable risk of death or serious bodily injury" under 18 U.S.C. § 3286. TR 1246-1247 (A-1308 to A-1309).

Neither counsel requested an instruction concerning § 2339D's date of enactment, and no such instruction was provided. As a result, the jury was not asked

to determine whether the Defendant received military training *after* December 17, 2004. Nor was it required to find that such training gave rise to a foreseeable risk of death or serious bodily injury after December 17, 2004.

The jury deliberated for six days before returning the following partial verdict:

·       Not guilty as to Count 1, Conspiracy to Provide Material Support to Hizballah;

·       Guilty as to Count 3, Receipt of Military-Type Training from Hizballah;

·       Guilty as to Count 4, Marriage Fraud Conspiracy;

·       Not guilty as to Count 5, Citizenship Application Fraud;

·       Not Guilty as to Count 6, Naturalization Fraud

·       Guilty as to Count 7, False Statements

TR 1357-1361 (A-1419 to A-1423).

The jury was unable to return a verdict as to Count 2, and a mistrial was declared as to that count. *Id*.

The trial court thereafter set a timetable for post-trial motions, expressly asking counsel to brief whether the evidence was sufficient to establish that the Defendant's receipt of military training, in and of itself, created a foreseeable risk of death or serious injury sufficient to extend the statute of limitations under 18 U.S.C. § 3286. As the court noted:

> Under, 18 United States Code, Section 3286(b), there is no statute of limitations for various terrorism offenses, including the receipt of

19

military-type training from a foreign terrorist organization "if the commission of such offense resulted in or created a foreseeable risk of death or serious bodily injury". . .

At trial, I asked the government about its theory regarding the application of Section 3286(b) to Count Three. Citing the May 2, 2022 transcript at page 1078. The government responded as follows: "As the defendant admitted to the FBI, he received training in, among other things, the creation and how to detonate explosive devices, the use of AK-47s, the use of M16s, and then he came to the United States in part prepared to be, in his own words, a lone-wolf operative, someone who is trained to carry out, if needed, a mission. So his receipt of things like military-type training in which he learned how to construct an explosive, coupled with the tasking he received, suffices to establish that the training created a foreseeable risk of death or serious bodily injury to others." *Id.*

The reference to the task the defendant allegedly received from Hezbollah, presumably a reference to the photos and videos he took of landmarks in New York City, Boston and Washington, D.C. is of concern to me because Section 3286(b) requires that a defendant's "commission of" an offense creates a risk of death or serious bodily injury. As to Count Three, the offense that the defendant committed was receiving military-type training. To the extent that the government argues that the defendant's receipt of training in explosives and firearms itself created a foreseeable risk of death or serious bodily injury, on the theory that the defendant's training primed him to be a lone-wolf operative, this argument would effectively eliminate the statute of limitations for any military-type training charge. Accepting the government's argument, no statute of limitations would ever apply to a case in which a defendant received training and firearms and explosives.

Accordingly, I will need to see law demonstrating that this was Congress' intent, as well as case law demonstrating that courts have applied that understanding of the statute of limitations for the receiving military-type training offense.

TR 1362-1364 (A-1424 to A-1426).

20

IV. **Post Trial Motion for a Judgment of Acquittal**

At the court's request, the parties briefed the question of whether the evidence concerning the Defendant's receipt of training was sufficient to establish a risk of death or serious bodily injury. Defense counsel argued that the legislative history of 18 U.S.C. § 2339D contravened the Government's argument that "the mere receipt of training creates a foreseeable risk of death or serious physical injury." ECF 239, p. 8 (A-1490).

The Government responded that the risk of death or injury was ultimately a factual question for the jury; in the absence of any suggestion that the jury had been incorrectly instructed on the law, prosecutors argued that the court should defer to the jury's determination in this regard. ECF 242, p. 22-29 (A-1513 to A-1520). In particular, the Government argued that the jury could have properly relied on evidence concerning the Defendant's firearms and explosives training, his surveillance training, and Hizballah's history of violent acts. *Id.* at 23-29 (A-1514 to A-1520).

On September 28, 2022, the lower court denied Defendant's post-trial motion in an orally delivered decision. The court emphasized that it was not holding that "whenever a defendant receives explosives training from a foreign terrorist organization, this necessarily creates a foreseeable risk of harm," noting that "such an interpretation would effectively eliminate the statute of limitations for § 2339D

21

in all cases. . ." 9/28/22 Transcript at p. 22 (A-1558). But the court found that the evidence in this case *did* rise to such level, because of Hizballah's established "modus operandi of using improvised explosive devices in carrying out its attacks." *Id*. at 23. Likewise, the court concluded, the jury could have properly found "that Saab knew or reasonably should have known that death or serious bodily injury was a potential result of his surveillance activities." *Id*. at 24-26 (A-1560 to A-1562).

## V.   SENTENCING

On May 23, 2023, Mr. Saab appeared for sentencing. Judge Gardephe calculated a total offense level of 40. This calculation hinged, in part, upon the lower court's determination that the receipt of military-type training under 18 U.S.C. § 2339D constituted a "federal crime of terrorism," justifying a twelve-level enhancement under § 3A1.4. *See* 5/23/23 Sentencing Transcript at p. 21 (A-1596). Although Mr. Saab had no criminal history of any type, that same enhancement also mandated that he be placed in criminal history category VI.

Based on a total offense level of 40, and a criminal history of category VI, the Defendant's advisory sentence under the Guidelines was twenty years' incarceration – *i.e.*, the statutory maximum. *Id*. at 23 (A-1598).

Notwithstanding the high guidelines calculation, Judge Gardephe expressed his belief that Saab was not a danger to the community and presented a very low risk of recidivism, "particularly as to involvement in terrorism." *Id*. at 56 (A-1631). The

court imposed a sentence of ten years' imprisonment on Count 3, and two years on Counts 4 and 7, for a cumulative term of twelve years' imprisonment.[4]

## SUMMARY OF ARGUMENT

As set forth in greater detail below, the case against Mr. Saab was infected by *ex post facto* errors at every turn. First, the Government was permitted to revive what should have been a time-barred charge by arguing that 18 U.S.C. § 2339D was statutorily designated as a "federal crime of terrorism," subject to the extended statute of limitations described in 18 U.S.C. § 3286. But § 2339D was not designated as a "federal crime of terrorism" until March of 2006 – roughly a year after Mr. Saab had disassociated himself with Hizballah. Second, at trial, the Government was permitted to admit and rely upon evidence that Mr. Saab engaged in military-type training as far back as 1996, notwithstanding the fact that § 2339D was not a crime until December of 2004 – shortly before Saab cut his alleged ties with Hizballah. And finally, at sentencing, the Government *again* utilized § 2339D's purported designation as a "federal crime of terrorism" to massively enhance Mr. Saab's

---

[4] At sentencing and in the judgment, the lower court referred to the counts as numbered in the original indictment (as opposed to the verdict sheet). Hence, at sentencing, the Receipt of Military-Type Training was referred to as Count 4, Conspiracy to Commit Marriage Fraud was referred to as Count 6, and the False Statements charge was referred to as Count 9. For the sake of consistency, this brief refers to the counts as designated on the verdict sheet: we refer to Receipt of Military-Type Training herein as Count 3, Conspiracy to Commit Marriage Fraud as Count 4, and False Statements as Count 7.

offense level and criminal history category, despite the fact that § 2339D was not so-designated at the time of the alleged offense.

We respectfully submit that these pervasive *ex post facto* errors, which tainted virtually every aspect of the proceedings against Mr. Saab, mandate that his conviction on Count 3 be vacated.

## **ARGUMENT**

**POINT I:** **THE DEFENDANT'S ALLEGED RECEIPT OF MILITARY-TYPE TRAINING OCCURRED OUTSIDE THE APPLICABLE STATUTE OF LIMITATIONS**

As originally enacted, a violation of § 2339D was subject to the standard, five-year statute of limitations applicable to non-capital crimes under 18 U.S.C. § 3282.

However, on March 9, 2006, 18 U.S.C. § 2332b(g)(5)(B) – the provision which defines the term "federal crime of terrorism" – was amended to add § 2339D to its list of designated offenses.

This change had the effect of altering the applicable statute of limitations, bringing § 2339D under 18 U.S.C. § 3286, which provides for an "extension of [the] statute of limitation for certain terrorism offenses." In particular, 18 U.S.C. § 3286 creates an eight-year statute of limitations for "federal crimes of terrorism," unless the "commission of such offense resulted in, or created a foreseeable risk of, death or serious bodily injury to another person." In such case, "an indictment may be found . . . at any time without limitation for any offense listed in section 2332b(g)(5)(B)."

Hence, the applicable statute of limitations at the time of the Defendant's alleged offense was five years; at that time, no provision existed to extend the statute of limitations indefinitely based upon a foreseeable risk of death or serious harm.

In light of the above, this appeal presents the following, related questions concerning the statute of limitations:

(A) Did the amended statute of limitations – which became effective on March 9, 2006 – apply retrospectively to conduct that allegedly terminated in the spring of 2005?

(B) If the answer to the above question is yes, did the lower court err in not informing the jury – at a minimum – that the foreseeable risk of death or serious injury under § 3286 must have arisen *after* December 4, 2004 – *i.e.* the date on which receipt of military-type training became a crime?

(C) Was the evidence legally sufficient to establish that Saab's alleged receipt of military type training, in and of itself, created a foreseeable risk of death or serious injury sufficient to extend the statute of limitations indefinitely under 18 U.S.C. § 3286?

## A. There Was No Legal Basis to Apply an Extended Statute of Limitations Which Only Came into Existence After-the-Fact

As noted above, 18 U.S.C. § 2339D was not designated as a "federal crime of terrorism" until March of 2006 – roughly a year after the Defendant's alleged conduct had terminated.

This designation carried with it a number of legal ramifications. For instance, it created a rebuttable presumption of detention under 18 U.S.C.S. § 3142(e)(3)(c). It added § 2339D to the list of crimes which may constitute a predicate offense under

RICO. *See* 18 U.S.C. § 1961(1). As discussed further in Point III, it subjected offenders convicted under § 2339D to a draconian, twelve level sentencing enhancement under U.S.S.G. § 3A1.4. It increased both the statutory maximum and the recommended term of supervised release under 18 U.S.C.S. § 3583(j) and U.S.S.G. § 5D1.2(b)(1). And it expanded the statute of limitations, by bringing § 2339D under the purview of 18 U.S.C. § 3286.

As the Supreme Court has repeatedly emphasized, "[r]etroactivity is not favored in the law. Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208, 109 S. Ct. 468, 471 (1988). The Court has noted that this "presumption against retroactive legislation is deeply rooted in our jurisprudence, and embodies a legal doctrine centuries older than our Republic. Elementary considerations of fairness dictate that individuals should have an opportunity to know what the law is and to conform their conduct accordingly; settled expectations should not be lightly disrupted. For that reason, the principle that the legal effect of conduct should ordinarily be assessed under the law that existed when the conduct took place has timeless and universal appeal." *Landgraf v. Usi Film Prods.*, 511 U.S. 244, 265, 114 S. Ct. 1483, 1497 (1994).

In *Landgraf*, the Supreme Court described the two-step inquiry used to determine whether a statute may be applied retroactively:

When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules. When, however, the statute contains no such express command, the court must determine whether the new statute would have retroactive effect, *i. e.*, whether it would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed. If the statute would operate retroactively, our traditional presumption teaches that it does not govern absent clear congressional intent favoring such a result.

*Id*. at 280.

In this case, § 2339D was designated as a "federal crime of terrorism" as part of the USA Patriot Improvement and Reauthorization Act of 2005. The relevant section of that Act reads as follows:

SEC. 112. SECTION 2332b(g)(5)(B) AMENDMENTS RELATING TO THE DEFINITION OF FEDERAL CRIME OF TERRORISM.

(a) Additional Offenses. -- Section 2332b(g)(5)(B) of title 18, United States Code, is amended --
    (1) in clause (i), by inserting ", 2339D (relating to military-type training from a foreign terrorist organization)" before "or 2340A";
    (2) in clause (ii), by striking "or" after the semicolon;
    (3) in clause (iii), by striking the period and inserting "; or"; and
    (4) by inserting after clause (iii) the following:
        "(iv) section 1010A of the Controlled Substances Import and Export Act (relating to narco-terrorism).".

(b) Clerical Correction. -- Section 2332b(g)(5)(B) of title 18, United States Code, is amended by inserting ")" after – "2339C (relating to financing of terrorism".

There is nothing within this statutory language which expressly provides for retroactive application. As such, the question becomes whether applying this law to conduct that has already occurred would, in fact, have an impermissible "retroactive effect" under *Landgraf*. The Supreme Court further clarified this test in *Hughes Aircraft Co. v. United States ex rel. Schumer*, where it held:

> Every statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective.

*Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 947, 117 S. Ct. 1871, 1876 (1997).

Moreover, this formulation, the Court explained, is meant to be illustrative, not exhaustive:

> To the extent respondent contends that *only* statutes with one of these effects are subject to our presumption against retroactivity, he simply misreads our opinion in *Landgraf*. The language upon which he relies does not purport to define the outer limit of impermissible retroactivity. Rather, our opinion in *Landgraf,* like that of Justice Story, merely described that any such effect constituted a *sufficient,* rather than a *necessary,* condition for invoking the presumption against retroactivity. Indeed, we recognized that the Court has used various formulations to describe the "functional conception of legislative 'retroactivity,'" and made no suggestion that Justice Story's formulation was the exclusive definition of presumptively impermissible retroactive legislation.

> *Id*.

28

We respectfully submit that treating a violation of § 2339D which occurred prior to March 6, 2006 as a "federal crime of terrorism" unequivocally constitutes an impermissible retroactive application of the law. That is because such a retroactive designation would unquestionably impair vested rights acquired under the then-existing law, while creating new obligations, duties, and disabilities.

First, the retrospective application of the law would deprive a defendant of his presumptive, statutory right to bail.

Second, it would retroactively subject him to an increased sentence – *i.e.*, a lifetime term of supervised release – while also ratcheting up his advisory guidelines. Both of these results constitute unambiguous *ex post facto* violations. *See Lynce v. Mathis*, 519 U.S. 433, 441, 117 S. Ct. 891, 895-96 (1997) (laws which inflict "a greater punishment, than the law annexed to the crime, when committed. . . implicate the central concerns of the *Ex Post Facto* Clause."); *Peugh v. United States*, 569 U.S. 530, 533, 133 S. Ct. 2072, 2078 (2013) (*ex post facto* violation occurs when a defendant is sentenced under Guidelines promulgated after he committed his criminal acts, and the new version provides a higher applicable Guidelines sentencing range than the version in place at the time of the offense.); *United States v. Nichols*, 169 F.3d 1255, 1270 n.3 (10th Cir. 1999) ("We have no doubt that . . . retroactive application of the [section 3A1.4] adjustment would implicate the Ex Post Facto Clause.").

29

Third, it would increase his potential criminal liability, by qualifying his conduct as a predicate offense under RICO. The Sixth Circuit Court of Appeals has expressly held that the retroactive designation of a crime as a RICO predicate constitutes an impermissible retrospective application of the law, contrary to *Landgraf*. *See Snowden v. Lexmark Int'l, Inc*., 237 F.3d 620, 624-25 (6th Cir. 2001) ("the amendment adding copyright infringement to RICO would clearly increase a party's liability for past conduct under *Landgraf*.").

And finally, such a retroactive application would effectively eliminate a person's existing statute of limitation defense, especially in a case – like this one – where the Government asserts that such conduct gave rise to a foreseeable risk of death or serious injury. Notably, this aggravating factor was not a statutory consideration at the time Mr. Saab committed his alleged offense, and there was no way for him to anticipate that it was going to become one. *See Collins v. Youngblood*, 497 U.S. 37, 49, 111 L. Ed. 2d 30, 110 S. Ct. 2715 (1990) ("A law that abolishes an affirmative defense" violates the Ex Post Facto Clause).

In short, the court's error in retroactively treating § 2339D as a "federal crime of terrorism" constituted a plain and unambiguous mistake. And that error unquestionably affected the Appellant's substantial rights, by subjecting him to criminal liability for offense conduct that occurred outside the applicable statute of limitations. Because such error affected the fairness, integrity, and public reputation

30

of the proceedings, the Defendant's conviction on Count 3 should be set aside. *See United States v. Fuchs*, 218 F.3d 957, 962 (9th Cir. 2000) (incorrect jury charge on statute of limitations constituted plain error). Moreover, because the Government has stipulated that Mr. Saab did not receive training after the spring of 2005, that Count should be dismissed with prejudice.

**B.     Alternatively, if 18 U.S.C. § 3286 *Does* Apply, the Jury Should Have Been Instructed That It Needed to Find a Foreseeable Risk of Death or Serious Injury *After* December 4, 2004**

Even if this Court were to disagree with the above analysis, and conclude that the statute of limitations set forth in 18 U.S.C. § 3286 was applicable to conduct which terminated in the spring of 2005, the lower court's statute of limitations instruction would *still be erroneous*.

That statute provides, in relevant part, that:

> (b) . . . an indictment may be found . . . at any time without limitation for any offense listed in section 2332b(g)(5)(B) . . . if the commission of such offense resulted in, or created a foreseeable risk of, death or serious bodily injury to another person.

Hence, the question is whether the commission of the applicable offense – in this case 18 U.S.C. § 2339D – gave rise to a foreseeable risk of death or serious bodily injury. As discussed at length below, that offense did not even exist until December 17, 2004. It necessarily follows that events which occurred prior to that date did not constitute "the commission of such offense," and could not be considered in addressing the question of foreseeable risk. In short, the jury should

31

have been instructed that, in order to extend the statute of limitations applicable to §
2339D, it needed to find a foreseeable risk of death or serious injury arising *after* the
statutory date of enactment.

This legal error is clear and obvious for the reasons discussed *infra* in Point
II. Moreover, it affected the Defendant's substantial rights, especially where
prosecutors told the jury, during summation, that they could and should rely on
conduct predating December 17, 2004 to find a foreseeable risk of death or injury.
TR 1152-1155 (A-1214 to A-1217). In particular, prosecutors pointed to the most
obvious and dramatic examples of risk-creating behavior: the IED attack and the
assassination attempt, which allegedly took place in 1998 and 2003 respectively.
Under the circumstances, there is a strong probability that the jury relied upon such
pre-enactment conduct to find a foreseeable risk of death or injury.

Indeed, as set forth below, there is a significant question of whether the
Government introduced legally sufficient evidence that the Defendant's training, *in
and of itself*, gave rise to such a risk. Such evidence becomes all the more tenuous
when one restricts one's consideration to the narrow, four-month window between
the statutory enactment and Mr. Saab's repudiation of Hizballah. Because there is a
reasonable probability that the jury here followed the Government's urging, and
relied upon the extensive evidence of conduct predating the statutory date of

enactment in order to find a foreseeable risk of death or serious injury, the Appellant's conviction on Count 3 should be vacated.

**C.    The Evidence Was Legally Insufficient to Establish That Mr. Saab's Alleged Receipt of Military-Type Training Created a Foreseeable Risk of Death or Serious Injury**

Finally, we respectfully submit that irrespective of any charging error, the trial evidence was legally insufficient to establish a foreseeable risk of death or serious bodily injury arising from Mr. Saab's alleged receipt of training, in and of itself. Unlike the instructional issues discussed above, this issue was preserved and is subject to *de novo* review.

The lower court recognized the troubling implication underlying the Government's position.  "Military type training" necessarily imparts to the recipient knowledge which *could be* used to cause death or serious injury.  Indeed, the term is statutorily defined as:

> training in means or methods that can cause death or serious bodily injury, destroy or damage property, or disrupt services to critical infrastructure, or training on the use, storage, production, or assembly of any explosive, firearm or other weapon, including any weapon of mass destruction.

18 U.S.C.S. § 2339D(c)(1).

But while the receipt of such training may create or enhance a person's latent ability to cause death or serious injury, that mere potential does not, *in and of itself*, create a foreseeable risk that such injury will *actually* occur.  Rather, such risk only

materializes if the person chooses or attempts to employ such training in a way likely to cause harm. As the lower court noted, if the mere receipt of such knowledge, *in and of itself*, created a foreseeable risk of death or serious injury, this would effectively the eliminate the statute of limitations for any offense charged under § 2339D.

The lower court, resisting this conclusion, sought to articulate why the evidence here showed something above and beyond the mere possession of military knowledge. First, it noted that Hizballah had a history of employing improvised explosive devices. Second, it ruled that the Defendant's alleged conduct in photographing landmarks as a Hizballah trainee could be considered part of his military-type training, and that such surveillance created a foreseeable risk of death or serious bodily injury. 9/28/22 Transcript at p. 22-26 (A-1558 to A-1562). We respectfully submit that the lower court's efforts to distinguish the Defendant's conduct from a run-of-the-mill training case fail.

First of all, it is unclear how Hizballah's history of bomb attacks sets it apart from other "foreign terrorist organizations." That term, by statutory definition, entails an organization engaged in terrorism, the very nature of which involves violent activity. *See* 8 U.S.C. §§ 1189, 1182 (a)(3)(B); 22 U.S.C. 2656f(d)(2) (defining "terrorism" and "terrorist activity"). In short, it will always be possible to point to a history of violent acts on the part of a terrorist organization; it is precisely

that history which allows the State Department to designate a group as a "foreign terrorist organization." As a result, this purported distinguishing fact does nothing to actually narrow the Government's overbroad construction of 18 U.S.C. § 3286.

Second, even if the Defendant's purported photography of landmarks could be properly characterized as "training" – and that assertion seems questionable – such training, in and of itself, could not give rise to a foreseeable risk of death or injury in the absence of evidence that Mr. Saab supplied such pictures to Hizballah. And here, the record is silent – the Government adduced no evidence that Mr. Saab provided pictures or videos to anyone within Hizballah. Instead, the Government proved only that Saab *took* photographs. But merely taking a picture does not, in and of itself, create a risk of death or serious bodily injury.

Finally, it is important to note that the vast majority of the purported surveillance evidence related to conduct occurring prior to December 17, 2004. For the reasons set forth above in Point I (B), this Court should reject any argument that conduct predating § 2339D's enactment may be considered in evaluating the legal sufficiency of the evidence.

Because the evidence was legally insufficient to prove that the Defendant's alleged receipt of training, in and of itself, gave rise to foreseeable risk of death or injury, and because such evidence was necessary to bring the Defendant's conduct

within the statute of limitations, his conviction should be vacated and Count 3 should be dismissed with prejudice.

**POINT II:** **THE FAILURE TO PROPERLY CHARGE THE JURY ON THE NEED TO FIND POST-ENACTMENT CONDUCT VIOLATED THE DEFENDANT'S DUE PROCESS RIGHTS AND CONSTITUTED PLAIN ERROR**

### A.    Applicable Law

18 U.S.C. § 2339D – "Receiving Military-Type Training from a Foreign Terrorist Organization" – was enacted on December 17, 2004 as part of the Intelligence Reform and Terrorism Prevention Act of 2004.  As described above, Mr. Saab's criminal conduct in this case was alleged to have occurred between 1996 and the spring of 2005.  Hence, the *vast* majority of his alleged conduct actually predated the existence of the applicable statute.

Where an individual has engaged in an ongoing course of conduct that commenced before the enactment of the relevant criminal statute – but which continued thereafter – he may be charged and convicted based upon his *post-enactment* conduct.  But the court must be careful to assure that the jury's verdict does "not rest exclusively upon conduct which took place before the [statute's] enactment." *United States v. Marcus*, 560 U.S. 258, 261, 130 S. Ct. 2159, 2163 (2010).  In such circumstances, a trial judge can and should utilize a jury instruction to assure the defendant is not convicted "solely on the basis of conduct that was not

36

criminal when the defendant engaged in that conduct." *Id.* at 243-264. The failure to so-charge a jury when requested amounts to a due process violation. *Id*. at 264.

When a defendant fails to timely raise this issue at trial, the claim is subject to plain error review on appeal, where it becomes the appellant's obligation to demonstrate: "(1) there is an error; (2) the error is clear or obvious . . .; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." *Marcus*, 560 U.S. at 262.[5]

The Second Circuit applied that plain error standard on remand in *Marcus* – a case involving charges of forced labor and sex trafficking. In conducting its analysis, this Court acknowledged that the failure to properly charge a jury on the statutory date of enactment constitutes a clear and obvious error. Hence, the question of plain error hinges on whether there is a "reasonable possibility that the jury might have convicted [the defendant] based exclusively on pre-enactment conduct."

---

[5]     Prior to the Supreme Court's holding in *Marcus*, this Court applied a different rule, holding that the failure to properly charge the jury as to the date of statutory enactment mandated a retrial "whenever there is any possibility, no matter how unlikely, that the jury could have convicted based exclusively on pre-enactment conduct." *See United States v. Marcus*, 538 F.3d 97, 102 (2d Cir. 2008), *citing United States v. Torres*, 901 F.2d 205 (2d Cir. 1990). The Supreme Court held that this standard was incompatible with the plain error standard, and remanded the case back to this Circuit for further consideration.

*United States v. Marcus*, 628 F.3d 36, 41 (2d Cir. 2010). Among other things, this Court considered the strength of post-enactment evidence, the extent to which such conduct differed from the pre-enactment evidence, and whether the defendant was prejudiced by the "nature or quantity of the evidence of . . . pre-enactment conduct." *Id*. at 42-43.

Ultimately, this Court concluded that there was no plain error as to the forced labor count, where Marcus had engaged in an undifferentiated course of conduct by coercing his victim to work both before and after the statutory date of enactment, where the jury heard about only ten months of conduct pre-dating the statute, and where some of the most compelling evidence related to the defendant's post-enactment conduct. *Id*. at 43.

By way of contrast, however, this Court vacated Marcus' sex trafficking conviction, which rested on three separate and discrete acts by the defendant – the recruitment of the victim, which took place in 1998 (before the October 2000 date of enactment), the transportation of the victim, which took place in early 2000 (before the date of enactment), and the defendant's harboring the victim, which took place from 1999 through 2001 (both before and after the date of enactment). Hence, even though there was legally sufficient evidence of sex trafficking after the date of enactment, this Court found plain error:

> Unlike with the forced labor charge, the conduct supporting the sex
> trafficking charge differed materially before and after October 2000,

38

such that there is a reasonable probability that the erroneous jury charge affected the outcome of the trial and affected the fairness, integrity or public reputation of the proceedings.

*United States v. Marcus*, 628 F.3d 36, 44 (2d Cir. 2010).

## B.    Discussion

Applying the foregoing law to the facts of this case compels the conclusion that the lower court committed plain error in failing to instruct the jury concerning the need to find post-enactment conduct.

To begin with, as in *Marcus*, the failure to properly charge the jury on the date of enactment constituted a plain and obvious legal error. *See also United States v. Tykarsky*, 446 F.3d 458, 480 (3d Cir. 2006) (error in failing to charge jury on the need to find post-enactment conduct "was plain in that it was an obvious mistake in retrospect.").

Hence, the determinative question is whether there is "reasonable probability that the error affected the outcome of the trial." *United States v. Marcus*, 628 F.3d 36, 42 (2d Cir. 2010). We respectfully submit that there is.

The overwhelming bulk of the evidence that was introduced in this case pre-dated the existence of the applicable statute. The jury heard testimony concerning approximately one hundred and eight months of conduct which predated the enactment of the statute, versus – *at best* – four months of conduct postdating the date of enactment. To put this in statistical terms, the four months of alleged conduct

occurring *after* the date of enactment represented only 3.5% of the total time period introduced into evidence. Whereas the jury in *Marcus* heard evidence of acts that preceded the enactment of the statute by a matter of months, the evidence here went back *eight years* prior to the enactment of § 2339D.

Indeed, the vast majority of the Defendant's purported training took place before the statute even existed, including his alleged receipt of weapons training in 1999, as well as his 2003 surveillance and counterintelligence training. TR 199-200; 459 (A-261 to A-262; A-521). The Government introduced evidence that Mr. Saab attended such training sessions 20 to 30 times between 2000 and 2004. TR 201 (A-263).

By way of comparison, the evidence of post-enactment conduct was slim and ambiguous. While there was testimony that Mr. Saab received three weeks of explosives training at a safe house "[i]n approximately 2004 and 2005," the precise dates of such training are unclear from the record. TR 539 (A-601). And while there was also testimony that one of the Defendant's bags tested positive for explosive residue in April of 2005, there was no testimony as to how long trace explosive residue persists or may be detected.

In order to affirm the verdict, this Court would have to conclude there is *no* reasonable probability that the jury relied on the extensive evidence of pre-enactment training to convict Mr. Saab. We respectfully submit that it is simply not

possible to make that assessment, in a case where prosecutors *expressly* told the jury that they could convict Mr. Saab based upon events that took place prior to December of 2004. TR 1149 (A-1211).

That is particularly true because the Government's evidence focused on discrete incidents of training, which differed over time, and which occurred mostly before the date of enactment. In this regard, the evidence in this case is more analogous to the sex trafficking count vacated by this Court in *Marcus* than the forced labor conviction which it affirmed. While the latter count described an ongoing course of mostly undifferentiated conduct, the former hinged upon discrete acts undertaken by the defendant in recruiting, transporting, and harboring the victim on different dates – any one of which would have been sufficient to convict Marcus. Under the circumstances, this Court held that there was a reasonable probability that Marcus could have been convicted based on pre-enactment conduct.

Similarly, in this case, Mr. Saab could have been convicted based upon *any* of the separate and discrete training sessions which the Government described as occurring between 1996 and the spring of 2005.[6] It is clear from the jury's verdict

---

[6]    18 U.S.C. § 2339D is not a "continuing offense" – rather, it is complete whenever a person receives military training with the requisite *mens rea*. *See Toussie v. United States*, 397 U.S. 112 (1970) (describing presumption against continuing offenses); *see also United States v. Hassoun*, No. 04-60001-CR, 2007 U.S. Dist. LEXIS 85684, at *34 (S.D. Fla. Nov. 20, 2007) (18 U.S.C. § 2339A is not a continuing offense).

that it did not unconditionally accept all of the Government's allegations against Mr. Saab. But in the absence of an appropriate limiting instruction or special verdict sheet, it is impossible to know *which* specific allegations it relied upon.

Because there is a reasonable probability that the Defendant was convicted based on offense conduct which occurred before the receipt of military training was even a crime, his conviction under Count 3 should be vacated.

**POINT III. THE LOWER COURT COMMITTED PROCEDURAL SENTENCING ERROR WHEN IT ENHANCED THE DEFENDANT'S OFFENSE LEVEL UNDER U.S.S.G. § 3A1.4, BECAUSE 18 U.S.C. § 2339D DID NOT BECOME "A FEDERAL CRIME OF TERRORISM" UNTIL MARCH OF 2006**

As set forth above in Point I, 18 U.S.C. § 2339D did not become a "federal crime of terrorism" until March 9, 2006. That statutory designation dramatically changed the applicable sentencing Guidelines, by subjecting the offense to the "Terrorism" enhancement of U.S.S.C. § 3A1.4. That section provides:

> (a)     If the offense is a felony that involved, or was intended to promote, a federal crime of terrorism, increase by **12** levels; but if the resulting offense level is less than level **32**, increase to level **32**.

> (b)     In each such case, the defendant's criminal history category from Chapter Four (Criminal History and Criminal Livelihood) shall be Category VI.

The application of this enhancement had a massive impact upon Mr. Saab's advisory guidelines, resulting in a total offense level of 40 and criminal history category of VI (despite his utter lack of criminal history). 5/23/23 Sentencing

Transcript at p. 23. That calculation yielded an advisory sentence of twenty years' incarceration – *i.e.*, the statutory maximum.

Without the enhancement, Mr. Saab's offense level on would have been 28, and his criminal history category I.[7] His advisory sentence would have been 78-97 months – roughly *one third* of the advisory sentence calculated by the court, and between five-and-a-half to four years less than the sentence *actually* imposed.

Article I, § 10, of the United States Constitution "flatly prohibits retroactive application of penal legislation." *Lynce v. Mathis*, 519 U.S. 433, 439 n.12, 117 S. Ct. 891, 895 (1997). The Constitutional prohibition against *ex post facto* criminal laws reaches "[e]very law that aggravates a crime, or makes it greater than it was, when committed . . . [and] [e]very law that changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." *Calder v. Bull*, 3 U.S. (3 Dall.) 386, 390 (1798). This includes the retroactive application of aggravating Guidelines provisions. *Peugh v. United States*, 569 U.S. 530, 533, 133 S. Ct. 2072, 2078 (2013); *United States v. Nichols*, 169 F.3d 1255, 1270 n.3 (10th Cir. 1999) (noting that retroactive application of U.S.S.C. § 3A1.4 would clearly implicate the *ex post facto* clause.).

---

[7] Because the offense level on Counts 4 and 7 was only 11, no additional units would be assigned under USSG §3D1.4, and these Counts would not affect the total offense level.

Indeed, the prohibition against the *ex post facto* application of sentencing enhancements is so well entrenched, a violation of this principle will be treated as plain error. *See United States v. Keigue,* 318 F.3d 437 (2d Cir. 2003) (using incorrect version of Sentencing Guidelines constituted plain error); *United States v. Keller*, 58 F.3d 884, 893 (2d Cir. 1995) (finding plain error and stating that "because the wrong version of the Guidelines was used to determine [defendant's] sentence, we must vacate it and remand for re-sentencing"); *United States v. Orr*, 68 F.3d 1247, 1252 (10th Cir. 1995) ("*ex post facto* application of a sentencing guideline to the disadvantage of a defendant is plain error."); *United States v. Syme*, 276 F.3d 131, 136 (3d Cir. 2002) (finding plain error and *ex post facto* violation where defendant was sentenced using enhancement not in effect at time crime was committed); *United States v. Chea*, 231 F.3d 531, 539-40 (9th Cir. 2000) (finding plain error standard met where incorrect version of Guidelines was applied at sentencing); *United States v. Comstock*, 154 F.3d 845, 850 (8th Cir. 1998) (finding plain error standard met where incorrect version of Guidelines was applied and *ex post facto* violation resulted); *United States v. Anderson*, 61 F.3d 1290, 1301 (7th Cir. 1995) ("We have held that a district court commits plain error when it applies the sentencing Guidelines in a manner that violates the *Ex Post Facto* Clause."); *United States v. Davis*, 397 F.3d 340, 349-50 (6th Cir. 2005) (*ex post facto* violation constituted plain error).

Accordingly, because the lower court plainly erred in applying U.S.S.C. § 3A1.4 to conduct which was not, at the time of the offense, a "federal crime of terrorism," and because that error affected Mr. Saab's substantial rights and the fairness of the underlying proceedings, we respectfully submit that at a bare minimum, this Court should remand the instant matter for resentencing based upon the correctly calculated Guidelines.

## CONCLUSION

For the reasons set forth above, the Appellant's conviction on Count 3 should be vacated and that Count should be dismissed. Alternatively, this Court should remand this matter for resentencing.

Dated:      Garden City, New York
              July 16, 2024

Respectfully submitted,

By:    /s/ Matthew W. Brissenden
Matthew W. Brissenden, P.C.
*Counsel for Alexei Saab*
666 Old Country Road, Suite 501
Garden City, NY 11530
516-683-8500

## <u>CERTIFICATE OF COMPLIANCE</u>

As counsel of record to Defendant-Appellant, I hereby certify that this brief complies with the type - volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate Procedure. I am relying upon the word count of the word-processing system (Microsoft Word) used to prepare the brief, which indicates that 10,727 words appear in the brief.

By: /s/ Matthew W. Brissenden
Matthew W. Brissenden, P.C.
*Counsel for Alexei Saab*
666 Old Country Road, Suite 501
Garden City, NY 11530
516-683-8500

# SPECIAL APPENDIX

i

## TABLE OF CONTENTS

**Page**

Judgment, dated June 2, 2023 .................................... SPA-1

SPA-1

AO 245B (Rev. 09/19)    Judgment in a Criminal Case    (form modified within District on Sept. 30, 2019)
Sheet 1

# UNITED STATES DISTRICT COURT

### Southern District of New York

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | ) | **JUDGMENT IN A CRIMINAL CASE** |
| v. | ) | |
|  | ) | |
| Alexei Saab | ) | Case Number:  1:19 CR 676 -1 (PGG) |
| a/k/a "Ali Hassan Saab" | ) | |
| a/k/a "Alex Saab" | ) | USM Number:  87009-054 |
| a/k/a "Rachid" | ) | |
|  | ) | Marlon G. Kirton |
|  | ) | Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s) _____

☐ pleaded nolo contendere to count(s) _____
  which was accepted by the court.

☑ was found guilty on count(s)    4, 6, 9
  after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 USC §§ 2339D, 3238 | Receipt of Military-Type Training from Hizballah | 12/31/2005 | 4 |
| 18 USC § 371, | Marriage Fraud Conspiracy | 7/31/2019 | 6 |
| 8 USC § 1325(c) | | | |

The defendant is sentenced as provided in pages 2 through ____8____ of this judgment.  The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☑ The defendant has been found not guilty on count(s)    1, 7, 8,

☑ Count(s)    2, 3 and 5    ☐ is    ☑ are dismissed on the motion of the United States.

It is ordered that the defendant must notify the United States attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid.  If ordered to pay restitution, the defendant must notify the court and United States attorney of material changes in economic circumstances.

5/23/2023
Date of Imposition of Judgment

*Paul S Gardeph*
Signature of Judge

Hon. Paul G. Gardephe, U.S.D.J.
Name and Title of Judge

June 2, 2023
Date

SPA-2

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 1A

Judgment—Page   2   of   8

DEFENDANT:   Alexei Saab a/k/a "Ali Hassan Saab" a/k/a "Alex Sa
CASE NUMBER:   1:19 CR 676 -1 (PGG)

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Offense Ended | Count |
|---|---|---|---|
| 18 U.S.C. § 1001 | False Statements | 3/31/2015 | 9 |

SPA-3

AO 245B (Rev. 09/19) Judgment in Criminal Case
Sheet 2 — Imprisonment

Judgment — Page __3__ of __8__

DEFENDANT:   Alexei Saab a/k/a "Ali Hassan Saab" a/k/a "Alex Sa
CASE NUMBER:   1:19 CR 676 -1 (PGG)

## IMPRISONMENT

The defendant is hereby committed to the custody of the Federal Bureau of Prisons to be imprisoned for a total term of:
10 years' imprisonment on Count Four and two years' imprisonment on each of Counts Six and Nine.  The terms on Counts Six and Nine will run concurrently with each other but consecutively to the term of imprisonment imposed on Count Four.

☑ The court makes the following recommendations to the Bureau of Prisons:
It is recommended that the defendant be designated to FCI Otisville, FCI Danbury, FCI Fort Dix, or FCI Allenwood.
It is recommended that the defendant be considered for admission to the Bureau of Prisons' RDAP program.

☑ The defendant is remanded to the custody of the United States Marshal.

☐ The defendant shall surrender to the United States Marshal for this district:

    ☐ at _____ ☐ a.m.  ☐ p.m.  on _____ .

    ☐ as notified by the United States Marshal.

☐ The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:

    ☐ before 2 p.m. on _____ .

    ☐ as notified by the United States Marshal.

    ☐ as notified by the Probation or Pretrial Services Office.

## RETURN

I have executed this judgment as follows:

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.

_____
UNITED STATES MARSHAL

By _____
DEPUTY UNITED STATES MARSHAL

SPA-4

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3 — Supervised Release

|  | Judgment—Page | 4 | of | 8 |
| --- | --- | --- | --- | --- |

DEFENDANT:   Alexei Saab a/k/a "Ali Hassan Saab" a/k/a "Alex Sa
CASE NUMBER:   1:19 CR 676 -1 (PGG)

## SUPERVISED RELEASE

Upon release from imprisonment, you will be on supervised release for a term of:

three years' supervised release on each of Counts Four, Six, and Nine, with those terms to run concurrently.

## MANDATORY CONDITIONS

1. You must not commit another federal, state or local crime.
2. You must not unlawfully possess a controlled substance.
3. You must refrain from any unlawful use of a controlled substance. You must submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.
   ☑ The above drug testing condition is suspended, based on the court's determination that you pose a low risk of future substance abuse. *(check if applicable)*
4. ☐ You must make restitution in accordance with 18 U.S.C. §§ 3663 and 3663A or any other statute authorizing a sentence of restitution. *(check if applicable)*
5. ☑ You must cooperate in the collection of DNA as directed by the probation officer. *(check if applicable)*
6. ☐ You must comply with the requirements of the Sex Offender Registration and Notification Act (34 U.S.C. § 20901, *et seq.*) as directed by the probation officer, the Bureau of Prisons, or any state sex offender registration agency in the location where you reside, work, are a student, or were convicted of a qualifying offense. *(check if applicable)*
7. ☐ You must participate in an approved program for domestic violence. *(check if applicable)*

You must comply with the standard conditions that have been adopted by this court as well as with any other conditions on the attached page.

SPA-5

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 3A — Supervised Release

Judgment—Page    5    of    8

DEFENDANT:  Alexei Saab a/k/a "Ali Hassan Saab" a/k/a "Alex Sa
CASE NUMBER:  1:19 CR 676 -1 (PGG)

## STANDARD CONDITIONS OF SUPERVISION

As part of your supervised release, you must comply with the following standard conditions of supervision. These conditions are imposed because they establish the basic expectations for your behavior while on supervision and identify the minimum tools needed by probation officers to keep informed, report to the court about, and bring about improvements in your conduct and condition.

1. You must report to the probation office in the federal judicial district where you are authorized to reside within 72 hours of your release from imprisonment, unless the probation officer instructs you to report to a different probation office or within a different time frame.
2. After initially reporting to the probation office, you will receive instructions from the court or the probation officer about how and when you must report to the probation officer, and you must report to the probation officer as instructed.
3. You must not knowingly leave the federal judicial district where you are authorized to reside without first getting permission from the court or the probation officer.
4. You must answer truthfully the questions asked by your probation officer.
5. You must live at a place approved by the probation officer. If you plan to change where you live or anything about your living arrangements (such as the people you live with), you must notify the probation officer at least 10 days before the change. If notifying the probation officer in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
6. You must allow the probation officer to visit you at any time at your home or elsewhere, and you must permit the probation officer to take any items prohibited by the conditions of your supervision that he or she observes in plain view.
7. You must work full time (at least 30 hours per week) at a lawful type of employment, unless the probation officer excuses you from doing so. If you do not have full-time employment you must try to find full-time employment, unless the probation officer excuses you from doing so. If you plan to change where you work or anything about your work (such as your position or your job responsibilities), you must notify the probation officer at least 10 days before the change. If notifying the probation officer at least 10 days in advance is not possible due to unanticipated circumstances, you must notify the probation officer within 72 hours of becoming aware of a change or expected change.
8. You must not communicate or interact with someone you know is engaged in criminal activity. If you know someone has been convicted of a felony, you must not knowingly communicate or interact with that person without first getting the permission of the probation officer.
9. If you are arrested or questioned by a law enforcement officer, you must notify the probation officer within 72 hours.
10. You must not own, possess, or have access to a firearm, ammunition, destructive device, or dangerous weapon (i.e., anything that was designed, or was modified for, the specific purpose of causing bodily injury or death to another person such as nunchakus or tasers).
11. You must not act or make any agreement with a law enforcement agency to act as a confidential human source or informant without first getting the permission of the court.
12. You must follow the instructions of the probation officer related to the conditions of supervision.

## U.S. Probation Office Use Only

A U.S. probation officer has instructed me on the conditions specified by the court and has provided me with a written copy of this judgment containing these conditions. For further information regarding these conditions, see *Overview of Probation and Supervised Release Conditions*, available at: www.uscourts.gov.

Defendant's Signature  _____     Date  _____

SPA-6

AO 245B (Rev. 09/19)    Judgment in a Criminal Case
                        Sheet 3D — Supervised Release

Judgment—Page ___6___ of ___8___

DEFENDANT:  Alexei Saab a/k/a "Ali Hassan Saab" a/k/a "Alex Sa
CASE NUMBER:  1:19 CR 676 -1 (PGG)

## SPECIAL CONDITIONS OF SUPERVISION

The defendant will submit his person, and any property, residence, vehicle, papers, computer, other electronic communication and data storage devices, cloud storage or media, and effects to a search by any U.S. Probation Officer where there is a reasonable suspicion that a violation of the conditions of supervised release has taken place.  Failure to submit to a search may be grounds for revocation.  The defendant will warn any other occupants that the premises may be subject to search pursuant to this condition.  Any search shall be conducted at a reasonable time and in a reasonable manner.

SPA-7

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 5 — Criminal Monetary Penalties

Judgment — Page ___7___ of ___8___

DEFENDANT: Alexei Saab a/k/a "Ali Hassan Saab" a/k/a "Alex Sa
CASE NUMBER: 1:19 CR 676 -1 (PGG)

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | **Assessment** | **Restitution** | **Fine** | **AVAA Assessment*** | **JVTA Assessment**** |
|---|---|---|---|---|---|
| **TOTALS** | $ 300.00 | $ | $ | $ | $ |

☐   The determination of restitution is deferred until _____. An *Amended Judgment in a Criminal Case (AO 245C)* will be entered after such determination.

☐   The defendant must make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| **Name of Payee** | **Total Loss*** | **Restitution Ordered** | **Priority or Percentage** |
|---|---|---|---|
| | | | |
| **TOTALS** | $ _____ 0.00 | $ _____ 0.00 | |

☐   Restitution amount ordered pursuant to plea agreement   $ _____

☐   The defendant must pay interest on restitution and a fine of more than $2,500, unless the restitution or fine is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐   The court determined that the defendant does not have the ability to pay interest and it is ordered that:

☐   the interest requirement is waived for the   ☐  fine  ☐  restitution.

☐   the interest requirement for the   ☐  fine   ☐  restitution is modified as follows:

* Amy, Vicky, and Andy Child Pornography Victim Assistance Act of 2018, Pub. L. No. 115-299.
** Justice for Victims of Trafficking Act of 2015, Pub. L. No. 114-22.
*** Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18 for offenses committed on or after September 13, 1994, but before April 23, 1996.

SPA-8

AO 245B (Rev. 09/19)   Judgment in a Criminal Case
Sheet 6 — Schedule of Payments

Judgment — Page __8__ of __8__

DEFENDANT:  Alexei Saab a/k/a "Ali Hassan Saab" a/k/a "Alex Sa
CASE NUMBER:  1:19 CR 676 -1 (PGG)

## SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties is due as follows:

**A**  ☑  Lump sum payment of $ __300.00__ due immediately, balance due

    ☐  not later than _____ , or
    ☐  in accordance with  ☐ C,  ☐ D,  ☐ E, or  ☐ F below; or

**B**  ☐  Payment to begin immediately (may be combined with  ☐ C,  ☐ D, or  ☐ F below); or

**C**  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after the date of this judgment; or

**D**  ☐  Payment in equal _____ *(e.g., weekly, monthly, quarterly)* installments of $ _____ over a period of _____ *(e.g., months or years)*, to commence _____ *(e.g., 30 or 60 days)* after release from imprisonment to a term of supervision; or

**E**  ☐  Payment during the term of supervised release will commence within _____ *(e.g., 30 or 60 days)* after release from imprisonment.  The court will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

**F**  ☐  Special instructions regarding the payment of criminal monetary penalties:

Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during the period of imprisonment.  All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

☐  Joint and Several

| Case Number Defendant and Co-Defendant Names *(including defendant number)* | Total Amount | Joint and Several Amount | Corresponding Payee, if appropriate |
|---|---|---|---|
| | | | |

☐  The defendant shall pay the cost of prosecution.

☐  The defendant shall pay the following court cost(s):

☐  The defendant shall forfeit the defendant's interest in the following property to the United States:

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) AVAA assessment, (5) fine principal, (6) fine interest, (7) community restitution, (8) JVTA assessment, (9) penalties, and (10) costs, including cost of prosecution and court costs.