# 23-6598

*To Be Argued By*:
SAM ADELSBERG

## United States Court of Appeals

### FOR THE SECOND CIRCUIT
### Docket No. 23-6598

◄─◆◆◆─►

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

ALEXEI SAAB, also known as ALI HASSAN SAAB,
also known as ALEX SAAB, also known as RACHID,

*Defendant-Appellant.*

───────────

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR THE UNITED STATES OF AMERICA

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York,*
*Attorney for the United States*
*of America.*
26 Federal Plaza, 37th Floor
New York, New York 10278
(212) 637-2200

SAM ADELSBERG,
JASON A. RICHMAN,
OLGA I. ZVEROVICH,
*Assistant United States Attorneys,*
*Of Counsel.*

**TABLE OF CONTENTS**

PAGE

Preliminary Statement . . . . . . . . . . . . . . . . . . . . . . .   1

Statement of Facts . . . . . . . . . . . . . . . . . . . . . . . . .   3

    A.   The Government's Case . . . . . . . . . . . . . . .   3

        1.   Saab's Recruitment to Hizballah and
             Early Training and Assignments . . . . .   4

        2.   Saab's Transition to Hizballah's
             External Security Organization . . . . . .   5

        3.   Saab's Explosives Training with
             Hizballah in 2005 . . . . . . . . . . . . . . . . .   6

        4.   Saab's Surveillance Activity for
             Hizballah . . . . . . . . . . . . . . . . . . . . . . .   8

    B.   The Defense Case, Rule 29 Motion, and
       Verdict . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

    C.   The Post-Trial Rule 29 Motion . . . . . . . . .   12

    D.   Sentencing . . . . . . . . . . . . . . . . . . . . . . . . . .   14

ARGUMENT:

POINT I—Saab's Statute-of-Limitations Challenges
    Are Waived In Part and Fail In Any Event . . .   14

    A.   The District Court Correctly Denied Saab's
       Rule 29 Motion . . . . . . . . . . . . . . . . . . . . . .   16

        1.   Applicable Law . . . . . . . . . . . . . . . . . . .   16

ii

PAGE

2. Discussion . . . . . . . . . . . . . . . . . . . . . . 17

B. Saab Waived His Challenges to the Jury
Instruction on Section 3286(b) . . . . . . . . . 22

   1. Relevant Facts . . . . . . . . . . . . . . . . . . 23

      a. Saab's Pretrial Filings and
         Requests to Charge . . . . . . . . . . . 23

      b. The Charge Conference and Jury
         Charge . . . . . . . . . . . . . . . . . . . . . 24

   2. Applicable Law . . . . . . . . . . . . . . . . . . 25

   3. Discussion . . . . . . . . . . . . . . . . . . . . . 26

C. In Any Event, Saab Has Not Established
that the District Court Plainly Erred in
Instructing the Jury on Section 3286(b) . . 30

   1. Applicable Law . . . . . . . . . . . . . . . . . . 30

      a. 18 U.S.C. § 3286 . . . . . . . . . . . . . 30

      b. 18 U.S.C. § 2339D . . . . . . . . . . . . 31

      c. The *Ex Post Facto* Clause and
         Retroactivity under *Landgraf* . . . 32

      d. Plain-Error Review . . . . . . . . . . . 34

   2. Discussion . . . . . . . . . . . . . . . . . . . . . 34

iii

PAGE

       a.   Saab Has Not Established that the District Court Plainly Erred by Instructing the Jury on Section 3286(b) . . . . . . . . . . . . . . . . . . . . . . 34

       b.   Saab Has Not Established that the District Court Plainly Erred by Not Instructing the Jury on Section 2339D's Enactment Date in the Section 3286(b) Instruction . . . . . 43

POINT II—Saab Has Not Established that the District Court Plainly Erred by Failing to Instruct the Jury that a Guilty Verdict on Count Three Could Not Rest Exclusively on Pre-Enactment Conduct . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

   A.   Applicable Law . . . . . . . . . . . . . . . . . . . . . . . 45

   B.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

POINT III—Saab Has Not Demonstrated that the District Court Plainly Erred by Applying the Guidelines Terrorism Enhancement . . . . . . . . 53

   A.   Applicable Law . . . . . . . . . . . . . . . . . . . . . . . 53

       1.   The Terrorism Enhancement . . . . . . . 53

       2.   Standard of Review . . . . . . . . . . . . . . 55

   B.   Relevant Facts . . . . . . . . . . . . . . . . . . . . . . 55

   C.   Discussion . . . . . . . . . . . . . . . . . . . . . . . . . . 57

iv

PAGE

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 60

## TABLE OF AUTHORITIES

*Cases*:

*Albernaz v. United States*,
    450 U.S. 333 (1981) . . . . . . . . . . . . . . . . . . . . . . . 37

*Baldwin v. City of Greensboro*,
    714 F.3d 828 (4th Cir. 2013) . . . . . . . . . . . . . . . . 41

*Cannon v. Univ. of Chicago*,
    441 U.S. 677 (1979) . . . . . . . . . . . . . . . . . . . . . . . 37

*City of Springfield v. Kibbe*,
    480 U.S. 257 (1987) . . . . . . . . . . . . . . . . . . . . . . . 26

*Collins v. Youngblood*,
    497 U.S. 37 (1990) . . . . . . . . . . . . . . . . . . . . . . . 32, 39

*Cruz v. Maypa*,
    773 F.3d 138 (4th Cir. 2014) . . . . . . . . . . . . . . . . 36

*Falter v. United States*,
    23 F.2d 420 (2d Cir. 1928) . . . . . . . . . . . . . . . . . . 35

*Fernandez-Vargas v. Gonzales*,
    548 U.S. 30 (2006) . . . . . . . . . . . . . . . . . . . . . . . 36, 41

*In re Enter. Mort. Acceptance Co. Sec. Litig.*,
    391 F.3d 401 (2d Cir. 2004) . . . . . . . . . . . . . . . . 39

*Jackson v. Virginia*,
    443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . . . 16

v

PAGE

*Johnson v. United States,*
    520 U.S. 461 (1997). . . . . . . . . . . . . . . . . . . . . . . 44

*Landgraf v. USI Film Products,*
    511 U.S. 244 (1994). . . . . . . . . . . . . . . . . . . . 32, 36

*Miles v. Apex Marine Corp.,*
    498 U.S. 19 (1990). . . . . . . . . . . . . . . . . . . . . . . 36

*Olivieri v. Stifel, Nicolaus & Co., Inc.,*
    112 F.4th 74 (2d Cir. 2024) . . . . . . . . . . . . . . . . 41

*Puckett v. United States,*
    556 U.S. 129 (2009). . . . . . . . . . . . . . . . . . . . . . 34

*Stogner v. California,*
    539 U.S. 607 (2003). . . . . . . . . . . . . . . . . . . . . . 35

*United States v. Abelis,*
    146 F.3d 73 (2d Cir. 1998) . . . . . . . . . . . . . . . . . 16

*United States v. Arigbodi,*
    924 F.2d 462 (2d Cir. 1991) . . . . . . . . . . . . . . . . 59

*United States v. Atilla,*
    966 F.3d 118 (2d Cir. 2020) . . . . . . . . . . . . . . . . 16

*United States v. Awan,*
    607 F.3d 306 (2d Cir. 2010) . . . . . . . 54, 55, 57, 58

*United States v. Barker,*
    723 F.3d 315 (2d Cir. 2013) . . . . . . . . . . . . . . . . 55

*United States v. Binday,*
    804 F.3d 558 (2d Cir. 2015) . . . . . . . . . . . . . 28, 29

*United States v. Caltabiano,*
    871 F.3d 210 (2d Cir. 2017) . . . . . . . . . . . . . . . . 26

vi

PAGE

*United States v. Chow,*
    993 F.3d 125 (2d Cir. 2021) . . . . . . . . . . . . . . . . 17

*United States v. Clare,*
    652 F. App'x 32 (2d Cir. 2016) . . . . . . . . . . . 17, 20

*United States v. Cramer,*
    777 F.3d 597 (2d Cir. 2015) . . . . . . . . . . . . . . . 59

*United States v. De,*
    216 F.3d 1073 (2d Cir. 2000) . . . . . . . . . . . . . . 59

*United States v. Diaz,*
    176 F.3d 52 (2d Cir. 1999) . . . . . . . . . . . . . . 55, 59

*United States v. DiCostanzo,*
    104 F.3d 349 (2d Cir. 1996) . . . . . . . . . . . . . . . 59

*United States v. Dussard,*
    967 F.3d 149 (2d Cir. 2020) . . . . . . . . . . . . . . . 34

*United States v. Fishman,*
    645 F.3d 1175 (10th Cir. 2011) . . . . . . . . . . . . . 52

*United States v. Gates,*
    84 F.4th 496 (2d Cir. 2023) . . . . . . . . . . . . . . . 55

*United States v. Gill,*
    674 F. App'x 56 (2d Cir. 2017) . . . . . . . . 28, 29, 30

*United States v. Giovanelli,*
    464 F.3d 346 (2d Cir. 2006) . . . . . . . . . . . . . 26, 29

*United States v. Graham,*
    275 F.3d 490 (6th Cir. 2001) . . . . . . . . . . . . . . . 58

*United States v. Harris,*
    79 F.3d 223 (2d Cir. 1996) . . . . . . . . . . . . . . 32, 33

vii

PAGE

*United States v. Hendricks*,
 921 F.3d 320 (2d Cir. 2019) . . . . . . . . . . . . . . . . 34

*United States v. Hertular*,
 562 F.3d 433 (2d Cir. 2009) . . . . . . . . . . . . . . . . 27

*United States v. Ho*,
 984 F.3d 191 (2d Cir. 2020) . . . . . . . . . . . . . . . . 17

*United States v. Hunt*,
 82 F.4th 129 (2d Cir. 2023) . . . . . . . . . . . . . . . . 43

*United States v. Jabar*,
 19 F.4th 66 (2d Cir. 2021) . . . . . . . . . . . . . . 16, 17

*United States v. Jass*,
 569 F.3d 47 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 55

*United States v. Landesman*,
 17 F.4th 298 (2d Cir. 2021) . . . . . . . . . . . . . . . . 16

*United States v. Marcus*,
 538 F.3d 97 (2d Cir. 2008) . . . . . . . . . . . . . . . . . 46

*United States v. Marcus*,
 560 U.S. 258 (2010). . . . . . . . . . . . . . . . . . . *passim*

*United States v. Marcus*,
 628 F.3d 36 (2d Cir. 2010) . . . . . . . . . . . . . *passim*

*United States v. Mitchell*,
 811 F. App'x 50 (2d Cir. 2020) . . . . . . . . . . . . . . 27

*United States v. Munoz-Franco*,
 487 F.3d 25 (1st Cir. 2007). . . . . . . . . . . . . . . . . 48

*United States v. Nunez*,
 73 F. App'x 495 (2d Cir. 2003) . . . . . . . . . . . . . . 59

viii

PAGE

*United States v. O'Garro*,
  700 F. App'x 52 (2d Cir. 2017) . . . . . . . . . . . . . . 26

*United States v. Panebianco*,
  543 F.2d 447 (2d Cir. 1976) . . . . . . . . . . . . . . . . 29

*United States v. Pastore*,
  No. 18-2482, 2022 WL 2068434
  (2d Cir. June 8, 2022) . . . . . . . . . . . . . . . . . . . . . 28

*United States v. Percoco*,
  13 F.4th 158 (2d Cir. 2021) . . . . . . . . . . . . . . . . 17

*United States v. Piette*,
  45 F.4th 1142 (10th Cir. 2022) . . . . . . . . . . . . . . 40

*United States v. Quinones*,
  511 F.3d 289 (2d Cir. 2007) . . . . . . . . . . . . . . . . 25

*United States v. Shea*,
  No. 23-6842-CR, 2024 WL 2130874
  (2d Cir. May 13, 2024) . . . . . . . . . . . . . . . . . . 27, 29

*United States v. Spero*,
  331 F.3d 57 (2d Cir. 2003) . . . . . . . . . . . . . . . . . 28

*United States v. Spruill*,
  808 F.3d 585 (2d Cir. 2015) . . . . . . . . . . . . . . . . 29

*United States v. Stewart*,
  590 F.3d 93 (2d Cir. 2009) . . . . . . . . . . . . . . . . . 54

*United States v. Thornburgh*,
  645 F.3d 1197 (10th Cir. 2011) . . . . . . . . . . . . . . 52

*United States v. Torres*,
  901 F.2d 205 (2d Cir. 1990) . . . . . . . . . . . . . . . . 29

ix

PAGE

*United States v. Villafuerte,*
   502 F.3d 204 (2d Cir. 2007) . . . . . . . . . . . . . . . . . 34

*United States v. Weingarten,*
   865 F.3d 48 (2d Cir. 2017) . . . . . . . . . . . . . *passim*

*United States v. Weinlein,*
   109 F.4th 91 (2d Cir. 2024) . . . . . . .   35, 36, 39, 40

*United States v. Weintraub,*
   273 F.3d 139 (2d Cir. 2001) . . . . . . . . . . . . . . . . 43

*United States v. Wellington,*
   417 F.3d 284 (2d Cir. 2005) . . . . . . . . . . . . . . . . 25

*United States v. Wells,*
   519 U.S. 482 (1997) . . . . . . . . . . . . . . . . . . . . 25, 29

*United States v. Whab,*
   355 F.3d 155 (2d Cir. 2004) . . . . . . . . . . . . . 37, 42

*United States v. Young,*
   745 F.2d 733 (2d Cir. 1984) . . . . . . . . . . . . . . . . 29

*United States v. Yu-Leung,*
   51 F.3d 1116 (2d Cir. 1995) . . . . . . . . . . . . . . . . 25

*Vernon v. Cassadaga Valley Cent. School Dist.,*
   49 F.3d 886 (2d Cir. 1995) . . . . . . . . . . .   38, 39, 41

*Statutes, Rules & Other Authorities*:

18 U.S.C. § 1001 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1015(a) . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 1546(a) . . . . . . . . . . . . . . . . . . . . . . . . . . 2

x

PAGE

18 U.S.C. § 2 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 2332b . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

18 U.S.C. § 2332b(g)(5) . . . . . . . . . . . . . . . . . . . . 53, 54

18 U.S.C. § 2332f . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

18 U.S.C. § 2339A . . . . . . . . . . . . . . . . . . . . . . . . . . . 57

18 U.S.C. § 2339B . . . . . . . . . . . . . . . . . . . . . . . . . 2, 57

18 U.S.C. § 2339D . . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 2339D(a) . . . . . . . . . . . . . . . . . . . . . . . . 31

18 U.S.C. § 3238 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

18 U.S.C. § 3282(a) . . . . . . . . . . . . . . . . . . . . . . . 30, 32

18 U.S.C. § 3286 . . . . . . . . . . . . . . . . . . . 23, 24, 30, 32

18 U.S.C. § 3286(b) . . . . . . . . . . . . . . . . . . . . . . *passim*

18 U.S.C. § 371 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

USA PATRIOT Act of 2001, Pub. L. No. 107-56,
    § 809, 115 Stat. 272 . . . . . . . . . . . . . . . . . . . 31, 37

Intelligence Reform and Terrorism Prevention Act
    of 2004, Pub. L. No. 108-458, § 6602,
    118 Stat. 3638 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

USA PATRIOT Improvement and Reauthorization
    Act of 2005, Pub. L. No. 109-177, § 112,
    120 Stat. 192 (2006) . . . . . . . . . . . . . . . . . . . . 32, 54

Fed. R. Crim. P. 12(b)(3)(B)(v) . . . . . . . . . . . . . . . . . 28

xi

PAGE

Fed. R. Crim. P. 29 . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

U.S.S.G. § 3A1.4 . . . . . . . . . . . . . . . . . . . . . 53, 54, 57

U.S.S.G. § 3A1.4(a) . . . . . . . . . . . . . . . . . . . 53, 54, 57

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

## Docket No. 23-6598

---

UNITED STATES OF AMERICA,

*Appellee,*

—v.—

ALEXEI SAAB, also known as Ali Hassan Saab, also known as Alex Saab, also known as Rachid,

*Defendant-Appellant.*

---

## BRIEF FOR THE UNITED STATES OF AMERICA

---

### Preliminary Statement

Alexei Saab appeals from a judgment of conviction entered on June 5, 2023, in the United States District Court for the Southern District of New York, by the Honorable Paul G. Gardephe, United States District Judge, following a three-week jury trial.

Indictment 19 Cr. 676 (PGG) (the "Indictment") was filed on September 19, 2019, charging Saab in nine counts. Trial commenced on April 20, 2022 on

2

seven of the nine counts in the Indictment[1]: conspiring to provide material support to Hizballah, in violation of 18 U.S.C. § 2339B ("Count One"); providing material support to Hizballah, in violation of 18 U.S.C. §§ 2339B and 2 ("Count Two"); receiving military-type training from Hizballah, in violation of 18 U.S.C. §§ 2339D and 3238 ("Count Three"); conspiring to commit marriage fraud, in violation of 18 U.S.C. § 371 ("Count Four"); committing citizenship application fraud, in violation of 18 U.S.C. §§ 1546(a) and 2 ("Count Five"); committing naturalization fraud, in violation of 18 U.S.C. §§ 1015(a) and 2 ("Count Six"); and making false statements, in violation of 18 U.S.C. §§ 1001 and 2 ("Count Seven").

On May 11, 2022, the jury convicted Saab on Counts Three, Four, and Seven, and acquitted him on Counts One, Five, and Six. The jury did not reach a unanimous verdict on Count Two, which the Government subsequently dismissed.

On May 23, 2023, Judge Gardephe sentenced Saab principally to twelve years' imprisonment, to be followed by three years' supervised release.

Saab is serving his sentence.

_____

[1]    Prior to trial, the Government informed the District Court that it would not be proceeding on Counts Three and Five of the Indictment. The remaining counts were renumbered for trial to be consecutive.

3

## Statement of Facts

### A.   The Government's Case

The Government's evidence at trial established that, from approximately 1996 to the spring of 2005, Saab received military-type training from Hizballah, a foreign terrorist organization.[2] Hizballah trained Saab in the use of firearms, including pistols, AK-47s, M-16s, and grenades; the construction and use of explosive devices, including improvised explosive devices ("IEDs"); and preoperational surveillance, intended for use in planning future terrorist attacks by Hizballah. Saab detailed these Hizballah training sessions over the course of eleven consensual interviews with the Federal Bureau of Investigation ("FBI") in 2019, before his arrest. Saab also described his years of Hizballah activity in his post-arrest statement and in proffer sessions with the Government.

At trial, the Government introduced Saab's detailed admissions through the testimony of FBI Special Agent Anthony Cipriano. The Government also introduced evidence that corroborated Saab's admissions, including the testimony of an expert witness who identified schematics of IEDs drawn by Saab as potentially viable explosive devices; surveillance photographs and videos seized from Saab's hard drive evidencing his years of preoperational surveillance for

---

[2]   Because Saab challenges only his conviction on Count Three, the Government sets forth only those facts relevant to that conviction.

4

Hizballah; and evidence that Saab's luggage tested positive for explosives residue in April 2005, just after Saab attended a multi-week Hizballah training session on how to build, test, and detonate explosive devices. The Government also introduced the testimony of Dr. Matthew Levitt, an opinion witness on Hizballah, who testified about Hizballah's structure and operations, history of violence and terrorist attacks, and training of operatives.

### 1. Saab's Recruitment to Hizballah and Early Training and Assignments

Saab told Agent Cipriano that he was recruited to Hizballah in 1996, while he was a student at the University of Lebanon. (A-256).[3] Saab explained that between 1996 and 2000, Saab met with Ibrahim, his first "handler"—a Hizballah member who provided "operational guidance and tasking and training." (A-257-58). Saab's first set of assignments was to conduct surveillance for Hizballah of locations in southern Lebanon that were associated with Israeli and South Lebanese Army troop positions. (A-260-61, 313). Saab explained

---

[3]   "GX" refers to a government exhibit at trial; "Br." refers to Saab's brief on appeal; "A-" refers to the appendix filed with Saab's brief; "Dkt." refers to an entry on the District Court's docket for this case; and "PSR" refers to the Presentence Investigation Report prepared by the United States Probation Office in connection with Saab's sentencing. Unless otherwise noted, case and record text quotations omit all internal quotation marks, citations, and previous alterations.

that he surveilled soldier checkpoints and security procedures, and then provided this information to Ibrahim in a written report to help facilitate Hizballah's "particularly devastating" IED operations against Israeli convoys in the area. (A-260-61, 313-14). Saab also described his first weapons training session with Ibrahim in approximately 1999, explaining that he was trained in the use of pistols, AK-47s, M-16s, and grenades. (A-261-62).

Saab described how, at some point between 1996 and 1998, Saab and his brother were directed to place an IED in Yaroun, Lebanon, targeting "an Israeli convoy that would carry a high-ranking official." (A-415; *see also* A-444-46). Approximately three weeks after planting the IED, Saab learned that it had detonated, injuring an Israeli official. (A-447).

### 2. Saab's Transition to Hizballah's External Security Organization

Saab explained that, in approximately late 2000, around the time that Saab moved from Lebanon to live in the United States, Ibrahim introduced Saab to a second Hizballah handler named Wissam. (A-262-63). Saab met with Wissam approximately 20 to 30 times in Lebanon between 2000 and 2004. (A-263). Saab came to understand that "he was being trained for external operations" for Hizballah. (A-262). Agent Cipriano testified that the component of Hizballah to which Saab described transitioning is known as the External Security Organization ("ESO"), a Hizballah "unit that is responsible for external operations; that is, terrorist

6

attacks and intelligence collection outside Lebanon." (A-249).

Saab explained that, starting in approximately 2003, he received multiple types of in-person training from Wissam, including countersurveillance and surveillance, counterintelligence, counterinterrogation, and explosives training. (A-263-64). Saab described measures that he and other trainees took to stay covert, including wearing masks and using code names. (A-264-65).

Saab explained that, in approximately 2003, he was directed by his Hizballah "field mentor" to shoot an individual Saab later came to learn was an Israeli spy. (A-251-52, 352, 354-55). Saab complied, but when he attempted to shoot the victim, the gun did not fire. (A-354).

### 3. Saab's Explosives Training with Hizballah in 2005

In 2005, Saab participated in extensive training in Lebanon in the manufacture and use of explosives. (A-266-68, 314-16, 323-24, 389-90, 401, 516, 529-30, 544-51; GX 220-M). Saab explained that he first participated in approximately three weeks of explosives training in the classroom, including training in triggering mechanisms, explosive substances, detonators, and the assembly of circuits. (A-266-68, 314). Saab described going to a "safe house," in which he changed into a military uniform, and then proceeded to an underground classroom used for the training. (A-314). Saab explained that the training was focused on "the specific shapes of explosive charges" that would be

7

used to target vehicles and people. (A-314). Saab also described training in the construction of an IED that he referred to as a "telescopic bomb," a circular device used to target personnel. (A-315). Saab explained that he was trained in different types of explosive materials, including "C4," ammonium nitrate (an explosive precursor that Saab was once tasked with procuring for Hizballah in the United States), and RDX. (A-315-16, 496-97).

As part of the explosives training, Saab participated in a field-training exercise where he built and tested IEDs, or homemade explosives "manufactured using parts that you would normally find available for purchase anywhere." (A-266-67). Saab described constructing a "sticky bomb," an explosive device that would detonate upon movement. (A-267). Saab tested the operability of the sticky bomb, and then detonated it in a mountainous area outside of Beirut. (A-267).

Saab explained that, as part of his explosives training, he was asked to review a photograph of "the blast site from the assassination" of Lebanese Prime Minister Rafic Hariri. (A-390). Agent Cipriano testified that Hariri was assassinated on February 14, 2005, when "[a] car bomb detonated outside of the St. George Hotel" as Hariri's convoy was passing by. (A-389-90; *see also* A-660-61). Saab also "described taking photographs of the blast site a few weeks after the [Hariri] assassination occurred." (A-401). At trial, the Government introduced a photograph, recovered from Saab's hard drive, depicting the St. George Hotel blast site. (GX 220). The metadata from the photograph showed that it was taken on March 8, 2005. (GX 220-M).

8

Saab explained that, in approximately April 2005, after the explosives training, he traveled back to the United States through Turkey. (A-268). Saab explained that he was stopped at Istanbul Airport due to "an explosive hit on his person," which he attributed to his participation in the field-training exercise in Lebanon where explosives had been detonated. (A-268). Former FBI Agent Greg McHugh, who interviewed Saab at JFK Airport on April 14, 2005, when Saab flew to the United States from Istanbul, testified that Saab admitted during the interview that he had been "detained by Turkish authorities based on the [detection] of explosive residue." (A-975).

During his interviews with the FBI, Saab sketched three detailed diagrams of IEDs that he had created and tested during his explosives training. (GX 301, 302, 303; A-332-38). FBI Special Agent Bomb Technician Brian Murtagh, an expert witness, reviewed Saab's diagrams and interview statements and testified that, based on his training and field experience with explosives, each of the diagrammed IEDs contained the components required for a viable and operable explosive device—namely, a power source, an initiator, explosives, and a switch. (A-807-20, 826-35). SABT Murtagh further described how IEDs can "kill or maim people." (A-816).

### 4. Saab's Surveillance Activity for Hizballah

Saab described receiving surveillance training and conducting extensive preoperational surveillance for Hizballah. (A-252-53, 316-17, 322-26, 328-30, 344, 346-47, 374, 394-96). Saab explained that, as part of

9

his surveillance training, he was directed by Wissam "to go to Istanbul, Turkey, and create a city guide for that city." (A-316). Saab traveled to Istanbul and conducted surveillance of particular sites, including the Blue Mosque, a palace, and street markets. (A-316-17). The Government introduced a marked-up "Istanbul City Guide" recovered from Saab's apartment, (A-122; GX 355); surveillance photographs, taken in Istanbul in 2005, recovered from Saab's hard drive, (*see, e.g.*, GX 115-23, 115-M–123-M); and Saab's passport showing his travel to Turkey, (GX 356 at 6). Dr. Levitt testified that Hizballah's ESO attempted "several" attacks in Istanbul, including, most prominently, the attempted assassination of the Israeli Consul General in 2010 or 2011. (A-700).

Saab explained that he also conducted significant "site surveillance" for Hizballah in the United States, including in New York City, Boston, and Washington, D.C. (A-252). The Government introduced photographs and videos recovered from Saab's hard drive, which showed that Saab conducted surveillance activity in the United States up through and including the spring of 2005. (*See, e.g.*, A-396 (detailing locations in New York City); GX 124-M, 125-M, 126-M, 127-M (metadata from photographs taken in 2005 of locations in New York City)).[4]

––––––––––

[4]   The parties stipulated that Saab ceased Hizballah-related operational activities in or about the spring of 2005. (GX 1003).

10

Saab explained that he conducted surveillance of more than 40 different locations in New York City alone, including the Port Authority Bus Terminal, the Brooklyn Bridge, and the Manhattan Bridge. (A-252, 325). Saab further explained that he focused on "soft spots," or structural and security weakness, in the objects he surveilled. (A-324-25). Saab explained that the purpose of his surveillance, which he detailed in a handwritten report to his handler, "was to facilitate [Hizballah's] bombing operations against those targets" and "to cause the most destruction." (A-252). In particular, with respect to locations such as the Brooklyn Bridge, Saab explained that "[t]he purpose was to allow [Hizballah] to determine the size and placement of the explosives that would be needed to destroy it." (A-330).

Saab explained that he used several techniques to disguise his surveillance activities. (A-1542-44). For example, Saab explained that he would start filming an unrelated object before panning to the true object of his surveillance, or take videos from a high altitude and then zoom in on the target. (A-1505-06; *see, e.g.*, GX 19, 20). When taking photographs, Saab would position someone in front of the true target, or take photographs where the target was visible but not the focus of the photograph. (A-1542-43; *see, e.g.*, GX 45). Saab further explained that he would photograph "multiple vantage points of bridges in order to show different angles," which was corroborated by videos and photographs found on his hard drive. (A-1506; *see, e.g.*, GX 24-26 (photographs of different vantage points of the Brooklyn Bridge); GX 94-96 (videos of different vantage points of the George Washington Bridge)).

11

The evidence at trial showed that Hizballah's attack planning program relied on preoperational surveillance such as that conducted by Saab. Dr. Levitt testified that Hizballah had operatives "collect preoperational surveillance" that could be used for future operations, and that this surveillance was akin to "off-the-shelf, available planning" that Hizballah had available to act on quickly if needed. (A-1507). This, Dr. Levitt explained, "sets [Hizballah] apart from other organizations." (A-1507).

## B. The Defense Case, Rule 29 Motion, and Verdict

Saab called two witnesses in his defense case, including Professor Thanassis Cambanis, an opinion witness on Hizballah. (A-980-1064).

After the close of evidence, Saab moved for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. Saab argued that, as to Counts One through Three, the evidence was legally insufficient to prove that "the commission of [the] offense resulted in, or created a for[e]seeable risk of, death or serious bodily injury to another person," as required to indefinitely extend the statute of limitations under 18 U.S.C. § 3286(b). (A-1135-37). Judge Gardephe reserved decision. (A-1140-41).

On May 11, 2022, the jury returned a partial verdict, convicting Saab on Counts Three, Four, and Seven; acquitting him on Counts One, Five, and Six; and not reaching a unanimous verdict on Count Two. (A-1418-22).

12

## C.   The Post-Trial Rule 29 Motion

In his post-trial Rule 29 motion, Saab acknowl-edged that "the applicability of 18 U.S.C. 3286(b) [was] an issue of fact to be decided by the jury," and that the District Court "properly charged as to the applicability of 18 U.S.C. 3286(b)." (A-1489-90). Saab again argued, however, that "[t]he Government failed to prove that Mr. Saab created a foreseeable risk of death or serious physical injury beyond a reasonable doubt." (Dkt. 244 at 3).[5]

In a detailed oral ruling issued on September 28, 2022, Judge Gardephe denied Saab's Rule 29 motion. (A-1537-64). Judge Gardephe noted that "the parties agree that the issue of foreseeability was for the jury, and that the Court properly instructed the jury with respect to the applicability of 18 U.S.C. § 3286(b)." (A-1556). Judge Gardephe rejected Saab's sufficiency-of-the-evidence challenge, ruling that "based on the evi-dence presented at trial, . . . a reasonable jury could have found beyond a reasonable doubt that Saab's re-ceipt of military-type training created a foreseeable risk of death or serious bodily injury to another per-son." (A-1558). "The jury could have reached that con-clusion in at least two different ways." (A-1558). First, "[a] reasonable jury could have found that Saab knew or reasonably should have known that death or serious

─────────

[5]   This page number, and the page numbers in other citations to filings in the District Court, refer to the CM/ECF-generated page numbers at the top of the page.

13

bodily injury was a potential result of his receiving specialized explosives training." (A-1558). As Judge Gardephe explained:

> [W]hen Saab received his specialized explosives training from Hizballah—training that continued approximately until April 2005—he was aware that it was not merely a hypothetical possibility that his training would be put to use by Hizballah. Hizballah had a proven track record of using explosive devices to carry out terrorist attacks, and the jury heard testimony that Saab, among other things, had constructed a fully operable "sticky bomb," which he then detonated in the mountains outside Beirut. Indeed, explosive residue from his participation in these exercises was found on his belongings when he passed through the Istanbul Airport in April 2005 on a return trip to the United States. And . . . , Saab and his brother had planted an IED that had actually detonated, causing injury to an Israeli official.

(A-1559-60). In addition, Judge Gardephe determined that a reasonable jury could have "concluded that Saab's surveillance activities in the United States were part of his military-type training, and that Saab knew or reasonably should have known that death or serious bodily injury was a potential result of his surveillance activities." (A-1560).

14

### D.   Sentencing

On May 23, 2023, Judge Gardephe sentenced Saab to ten years' imprisonment on Count Three and a consecutive term of two years' imprisonment on Counts Four and Seven. (A-1637).[6] Judge Gardephe also imposed a three-year term of supervised release and ordered Saab to pay the $300 mandatory special assessment. (A-1637).

# A R G U M E N T

## POINT I

### Saab's Statute-of-Limitations Challenges Are Waived In Part and Fail In Any Event

On appeal, Saab raises three statute-of-limitations challenges to his conviction on Count Three, which charged a violation of 18 U.S.C. § 2339D. First, Saab argues that the District Court plainly erred by instructing the jury on Section 3286(b) because Section 2339D only became subject to the extended statute of limitations in Section 3286(b) in March 2006, after Saab's offense conduct had terminated. (Br. 25-31). Second, Saab argues, in the alternative, that the District Court plainly erred by not instructing the jury that it was required to make the relevant finding

---

[6]   At sentencing, Judge Gardephe referred to Counts Three, Four, and Seven by their original numbers as charged in the Indictment: Counts Four, Six, and Nine, respectively. (A-1637).

15

under Section 3286(b)—that Saab's conduct created a foreseeable risk of death or serious bodily injury—based on Saab's conduct *after December 17, 2004*, Section 2339D's date of enactment.[7] Third, Saab argues, as he did in his Rule 29 motion, that the trial evidence was insufficient to allow a reasonable jury to find that Saab's conduct created a foreseeable risk of death or serious bodily injury, as required under Section 3286(b). (Br. 33-36).

None of Saab's challenges withstands scrutiny. Saab's third argument, challenging the sufficiency of the evidence, is meritless for the reasons Judge Gardephe set forth in denying Saab's Rule 29 motion.[8] Saab's first two arguments, challenging the District Court's jury instruction on Section 3286(b), are waived, because Saab repeatedly invited Judge Gardephe to apply Section 3286(b) and proposed a jury instruction that contained the alleged errors Saab now challenges on appeal. In any event, even if this Court applies plain-error review as Saab proposes, (*see* Br. 3, 30-33), Saab's challenges to the jury instruction fail.

--------

[7] In two places in his brief on appeal, Saab refers to the relevant date as December 4, 2004, (Br. 25, 31), but that appears to be an inadvertent misstatement.

[8] The Government addresses Saab's third argument first for ease of presentation

16

## A. The District Court Correctly Denied Saab's Rule 29 Motion

### 1. Applicable Law

"A defendant challenging the sufficiency of the evidence bears a heavy burden." *United States v. Landesman*, 17 F.4th 298, 319 (2d Cir. 2021). A jury verdict must be upheld if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). "A court may enter a judgment of acquittal only if the evidence that the defendant committed the crime alleged is nonexistent or so meager that no reasonable jury could find guilt beyond a reasonable doubt." *United States v. Atilla*, 966 F.3d 118, 128 (2d Cir. 2020). Where "either of the two results, a reasonable doubt or no reasonable doubt, is fairly possible, the court must let the jury decide the matter." *Landesman*, 17 F.4th at 319.

When considering the sufficiency of the evidence supporting a guilty verdict, this Court "must view the evidence in the light most favorable to the government." *United States v. Jabar*, 19 F.4th 66, 76 (2d Cir. 2021). This Court must analyze the pieces of evidence "in conjunction, not in isolation," and apply the sufficiency test "to the totality of the government's case and not to each element, as each fact may gain color from others." *Atilla*, 966 F.3d at 128. It is not the Government's burden to "disprove every possible hypothesis of innocence." *United States v. Abelis*, 146 F.3d 73, 80 (2d Cir. 1998). This Court must "credit[] every inference that could have been drawn in the government's

17

favor, and defer[ ] to the jury's assessment of witness credibility and its assessment of the weight of the evidence," *Jabar*, 19 F. 4th at 76, because "the task of choosing among competing, permissible inferences is for the jury, not for the reviewing court," *United States v. Ho*, 984 F.3d 191, 199 (2d Cir. 2020). This rule applies regardless of "whether the evidence being reviewed is direct or circumstantial," *United States v. Chow*, 993 F.3d 125, 135 (2d Cir. 2021); "the jury is entitled to base its decision on reasonable inferences from circumstantial evidence." *Ho*, 984 F.3d at 199.

This Court reviews "preserved claims of insufficient evidence *de novo*," *United States v. Percoco*, 13 F.4th 158, 169 (2d Cir. 2021), and unpreserved claims of insufficient evidence for plain error, *see, e.g.*, *United States v. Clare*, 652 F. App'x 32, 34 (2d Cir. 2016).

## 2. Discussion

As Judge Gardephe correctly determined in denying Saab's Rule 29 motion, the evidence was more than sufficient to allow a reasonable jury to find that Saab's receipt of military-type training from Hizballah created a foreseeable risk of death or serious bodily injury. (A-1558-63). As Judge Gardephe explained, "[a] reasonable jury could have found that Saab knew or reasonably should have known that death or serious bodily injury was a potential result of his receiving specialized explosives training," which continued until approximately April 2005. (A-1558-59). As part this training, Saab built and tested IEDs, including a fully operable "sticky bomb," which he then detonated in the mountains outside of Beirut. (A-266-67). Both

18

Hizballah opinion witnesses testified that Hizballah had a well-established track record of using IEDs, of the kind that Saab was trained to construct and operate, in carrying out terrorist attacks. Professor Cambanis testified that the use of IEDs "was one of [Hizballah's] central tactics in their guerilla war against the Israelis" between 1996 and 2005, and that bombing attacks against Israeli soldiers in Lebanon occurred "weekly, at least" during that period. (A-999-1000). Dr. Levitt similarly testified that in the mid-to-late 1990s, Hizballah engaged in "regular attacks" on Israeli forces in southern Lebanon, including "shooting attacks, sniper attacks, and roadside bombs involving IEDs." (A-636). Dr. Levitt described Hizballah's use in prior attacks of two specific explosive precursors, fertilizer and ammonium nitrate, which were part of Saab's training. (A-315-16, 496-97, 725).

The evidence showed that, at the time of his explosives training in 2005, Saab was aware of Hizballah's pervasive use of IEDs in carrying out violent attacks. Saab told Agent Cipriano that he understood that Hizballah would use his surveillance in southern Lebanon in the late 1990s to facilitate its "particularly devastating" IED attacks against Israeli troops in that region. (A-261, 314). Saab also told Agent Cipriano that, in the late 1990s, he and his brother had themselves planted an IED that later detonated, injuring an Israeli official. (A-415, 444-47). These events showed that, when Saab later constructed and detonated IEDs as part of his Hizballah explosives training in 2005, it was reasonably foreseeable to him that Hizballah would use the devices he built to kill or seriously injure others. On this record, Judge Gardephe correctly

19

determined that "a reasonable jury could have concluded that [Saab's] receipt of explosive training created a foreseeable risk of death or serious physical injury within the meaning of § 3286(b)." (A-1560).

In addition, a reasonable jury could have concluded that Saab's extensive surveillance activities for Hizballah, which continued until the spring of 2005, "were part of his military-type training, and that Saab knew or reasonably should have known that death or serious bodily injury was a potential result of his surveillance activities." (A-1560). At Hizballah's direction, Saab conducted surveillance of particular sites in Istanbul, (A-316-17)—a city that Hizballah attempted to attack on several occasions, (A-700). Saab also conducted extensive "site surveillance" for Hizballah in the United States to determine "soft spots," or structural and security weaknesses, in landmarks and infrastructure in American cities. (A-252, 324-25). Saab told Agent Cipriano that the purpose of his surveillance was "to facilitate Hezbollah's bombing operations against those targets" and "cause the most destruction." (A-252). Saab's surveillance activities were consistent with Hizballah's "modus operandi" of using "off-the-shelf, available planning" gained from preoperational surveillance to quickly facilitate terrorist attacks when needed. (A-705-06). On this record, a reasonable jury could have concluded that Saab's surveillance activities, which were part of his military-type training with Hizballah, created a foreseeable risk of death or serious bodily injury. (A-1562-63).

Saab's argument that "it is unclear how Hizballah's history of bomb attacks sets it apart from other foreign

20

terrorist organizations," (Br. 34), misses the mark.
The point is not that Hizballah had a history of bomb
attacks *per se*; it is that the record showed that Saab
knew of that history and knew that the purpose of his
military-type training was to facilitate Hizballah's
"particularly devastating" attacks. (A-261; *see* A-252,
314, 330, 415, 444-47).

Saab's contention that there is no evidence that he
provided the fruits of his surveillance activities to Hiz-
ballah, (Br. 35), is flatly belied by the record. Saab told
Agent Cipriano that he provided a handwritten report
of his surveillance of target locations in the United
States to his Hizballah handler "to facilitate Hezbol-
lah's bombing operations against those targets" and
"cause the most destruction." (A-252-53; *see also* A-
370-71 (Saab described that one purpose of his site sur-
veillance was to provide "additional detail to [Hizbal-
lah] by taking photographs" of things "of interest to
[Hizballah]."); A-394 ("[Saab] described having con-
ducted site surveillance in New York City, approxi-
mately 40 different locations, and also described them
by category, and then providing that information in
the form of a written report when he returned back to
Lebanon that he gave to his handler.")).

Finally, Saab argues that evidence of his Hizballah
activities predating December 17, 2004 (Section
2339D's date of enactment) should not be considered
in evaluating the sufficiency of the evidence. (Br. 35).
As an initial matter, because Saab did not make this
argument below, it is reviewed for plain error. *See
Clare*, 652 F. App'x at 34. Here, Saab cannot establish
plain error because the evidence was more than

21

sufficient for a reasonable jury to conclude that Saab's conduct postdating December 17, 2004 created a foreseeable risk of death or serious bodily injury. Indeed, the conduct on which the District Court relied in denying Saab's Rule 29 motion—Saab's explosives training in Lebanon and surveillance activities in the United States, (A-1558-63)—all occurred or continued through the spring of 2005, months after Section 2339D was enacted. Saab's explosives training "continued approximately until April 2005," when he returned to the United States with luggage that tested positive for explosives. (A-1559-60).[9] And contrary to Saab's assertion that none of his "surveillance of locations within the U.S. . . . took place after December of 2004," (Br. 17), metadata from photographs recovered

────────

[9] While Saab contends that "there was no testimony as to how long trace explosive residue persists or may be detected," (Br. 40), other evidence at trial confirmed that Saab received the explosives training in 2005—*after* Section 2339D was enacted. Saab told Agent Cipriano that one of his tasks during that training was to analyze a photograph of "the blast site from the assassination" of Lebanese Prime Minister Rafic Hariri, whom Hizballah assassinated on February 14, 2005. (A-389-90, 1011; *see also* A-660-61). Saab also told Agent Cipriano that he took photographs of the blast site of Hariri's assassination "a few weeks after the assassination occurred," (A-401), and the Government introduced a photograph taken in March 2005 and recovered from Saab's hard drive depicting Hariri's blast site, (GX 220, 220-M).

22

from Saab's hard drive showed that he conducted surveillance of locations in New York City—to, in Saab's words, "facilitate [Hizballah's] bombing operations against those targets" and "cause the most destruction," (A-252)—in 2005. (*See* GX 124-M, 125-M, 126-M, 127-M (surveillance photographs of, among other places, the Park Avenue Armory and Rockefeller Center)). Metadata from other photographs recovered from Saab's hard drive showed that his surveillance of Istanbul, through which he created a "city guide" for Hizballah, also occurred in 2005. (A-316; GX 115-M–123-M).

In sum, Judge Gardephe correctly determined that the evidence was more than sufficient to allow a reasonable jury to find that Saab's receipt of military-type training from Hizballah created a foreseeable risk of death or serious bodily injury, as required by Section 3286(b).

## B. Saab Waived His Challenges to the Jury Instruction on Section 3286(b)

Saab's arguments that the District Court should not have instructed the jury on Section 3286(b) or, in the alternative, should have instructed the jury to base any finding under Section 3286(b) on conduct postdating Section 2339D's date of enactment, (Br. 25-33), are waived, because Saab repeatedly invited Judge Gardephe to apply Section 3286(b) and proposed a jury instruction that contained the alleged errors Saab now challenges on appeal.

23

### 1. Relevant Facts

#### a. Saab's Pretrial Filings and Requests to Charge

In advance of trial, Saab advised the District Court that he intended to raise a statute-of-limitations defense at trial as to Counts One through Three. (Dkt. 155 at 10-11).[10] In doing so, Saab expressly stated that under 18 U.S.C. § 3286, the statute of limitations for each of these counts was eight years but extended indefinitely "if the commission of such an offense created a foreseeable risk of death or serious bodily injury to another person." (Dkt. 155 at 10 (citing 18 U.S.C. § 3286(b))). Saab advised that he intended to argue at trial that the "foreseeable risk of death or serious bodily injury" standard was not satisfied, and requested that the jury be required to make specific findings in that regard. (*Id.* at 10-11). Saab repeated this request in his proposed jury instructions. (Dkt. 161 at 18).

In response, Judge Gardephe issued an order stating, consistent with Saab's position, that in the event that Saab proceeded with his statute-of-limitations defense, the District Court expected "to charge the jury that—to convict the Defendant on [Counts One through Three]—the jury must find that the Government has proven beyond a reasonable doubt that Defendant's commission of the crimes charged in those

---

[10] The pretrial briefing referred to the charge of receiving military-type training as Count Four. This charge was renumbered as Count Three for trial.

24

counts resulted in, or created a foreseeable risk of, death or serious bodily injury to another person." (Dkt. 180 at 2). Judge Gardephe ordered the parties to submit "supplemental requests to charge addressing the meaning of the phrase 'resulted in, or created a foreseeable risk of, death or serious bodily injury to another person' under 18 U.S.C. § 3286(b)." (*Id.*).

Saab filed a supplemental request to charge in which he reiterated his position that, "[a]ssuming we raise a statute of limitations defense, the Government must prove conduct under 18 USC 3286(b) beyond a reasonable doubt." (Dkt. 189 at 2). Saab proposed that Judge Gardephe instruct the jury as follows, in relevant part:

> [I]f you find that the Government has proven beyond a reasonable doubt that the defendant engaged in conduct prior to the spring of 2005 that created a foreseeable risk of death or serious bodily injury to another person, then . . . there is no time limit to bring Count[ Three].

(*Id.*).

### b.   The Charge Conference and Jury Charge

In advance of the charge conference, Judge Gardephe circulated to the parties the District Court's proposed jury instructions. (A-1141). Saab raised no objections to the District Court's proposed instructions relating to Count Three or the statute of limitations, other than an objection—which Judge Gardephe

25

overruled—to the proposed definition of "foreseeable harm." (A-1154-58; *see* Dkt. 202 at 45-46).

With no further objection from Saab, Judge Gardephe instructed the jury on the statute of limitations in Section 3286(b). (A-1308-09). Consistent with Saab's proposed instruction, (Dkt. 182 at 2), Judge Gardephe instructed the jury that, "as to each of Counts One, Two, and Three, you must determine whether the government has proven beyond a reasonable doubt that the conduct that Mr. Saab allegedly engaged in created a foreseeable risk of death or serious bodily injury," (A-1308).

### 2.  Applicable Law

Under the invited-error doctrine, "a party may not complain on appeal of errors that he himself invited or provoked the district court to commit." *United States v. Wells*, 519 U.S. 482, 488 (1997). As this Court has explained, "when defendants obtain precisely what they affirmatively sought, it ill behooves them now to complain of error." *United States v. Quinones*, 511 F.3d 289, 321 (2d Cir. 2007); *see also, e.g.*, *United States v. Wellington*, 417 F.3d 284, 290 (2d Cir. 2005) (holding that defendant waived challenge to Guidelines calculation because he "cannot complain of an error that he himself invited"); *United States v. Yu-Leung*, 51 F.3d 1116, 1121 (2d Cir. 1995) (explaining that "forfeiture does not preclude appellate consideration of a claim in the presence of plain error, whereas waiver necessarily extinguishes the claim altogether").

A species of invited error occurs when a defendant challenges a jury instruction he proposed—in that

26

circumstance, the defendant has waived "any objection" to the instruction. *United States v. Caltabiano*, 871 F.3d 210, 219 (2d Cir. 2017); *see also United States v. Giovanelli*, 464 F.3d 346, 351 (2d Cir. 2006) (per curiam) ("[I]f a party invited the charge . . . , she has waived any right to appellate review of the charge"); *City of Springfield v. Kibbe*, 480 U.S. 257, 259 (1987) (per curiam) ("[T]here would be considerable prudential objection to reversing a judgment because of instructions that petitioner accepted, and indeed itself requested."); *United States v. O'Garro*, 700 F. App'x 52, 53-54 (2d Cir. 2017) (where defendant requested an instruction "identical in every material respect to the now-challenged instruction," it was a true waiver and foreclosed any review).

### 3. Discussion

Saab argues on appeal that the District Court committed a "plain and unambiguous mistake" by instructing the jury on Section 3286(b). (Br. 30; *see* Br. 33 (characterizing his challenge to the District Court's application of Section 3286(b) as an "instructional issue[ ]")). But, as the record makes clear, Saab repeatedly and consistently took the position below that Section 3286(b) applied and requested that the District Court instruct the jury accordingly. (Dkt. 155 at 10-11; *see also* Dkt. 161 at 18). Moreover, Saab proposed a jury instruction on Section 3286 that was materially the same as the one the District Court ultimately delivered. (*Compare* Dkt. 189 at 2 ("[I]f you find that the Government has proven beyond a reasonable doubt that the defendant engaged in conduct prior to the spring of 2005 that created a foreseeable risk of

27

death or serious bodily injury to another person, then . . . there is no time limit to bring Count[ Three].”), *with* A-1308 (“[A]s to [Count] Three, you must determine whether the government has proven beyond a reasonable doubt that the conduct that Mr. Saab allegedly engaged in created a foreseeable risk of death or serious bodily injury.”)).[11] In his post-trial Rule 29 motion, Saab acknowledged that the District Court “properly charged as to the applicability of 18 U.S.C. 3286(b).” (A-1490; *see also* A-1556 (“[T]he parties agree . . . that the [District] Court properly instructed the jury with respect to the applicability of 18 U.S.C. § 3286(b).”)).

Having affirmatively invited the District Court to apply and instruct the jury on Section 3286(b), and having proposed an instruction on Section 3286(b) that was in material part adopted, Saab waived any right to “complain on appeal” that the District Court erred by applying and instructing the jury on Section 3286(b). *See United States v. Shea*, No. 23-6842-CR, 2024 WL 2130874, at *2 (2d Cir. May 13, 2024) (“[A] defendant who has invited a challenged charge has waived any right to appellate review.” (quoting *United States v. Hertular*, 562 F.3d 433, 444 (2d Cir. 2009))); *United States v. Mitchell*, 811 F. App’x 50, 52 (2d Cir. 2020) (challenge to jury instruction waived where defendant stated that the district court’s proposed instructions were “fine” and “right in terms of what our

---

[11] Saab objected below to the definition of “foreseeable harm” in the statute-of-limitations instruction. (A-1154-58). Saab does not raise this challenge on appeal, and it has no bearing on the waiver analysis.

28

defense is"); *United States v. Gill*, 674 F. App'x 56, 58 (2d Cir. 2017) (challenge to jury instruction waived where "the parties jointly submitted a proposed charge that included the instruction on quantity about which [defendant] now complains"); *United States v. Binday*, 804 F.3d 558, 582-83 (2d Cir. 2015) (challenge to jury instruction waived where "the parties jointly submitted the language which defendants now contend was insufficiently clear").[12]

Saab's alternative argument—that the District Court should have instructed the jury to base any finding under Section 3286(b) on conduct postdating December 17, 2004, (Br. 31-33)—is likewise waived. Saab's own proposed jury instruction allowed the jury to base its finding under Section 3286(b) on any "conduct *prior to the spring of 2005*"—that is, at any time prior to the end of the charged period. (Dkt. 189 at 2 (emphasis added)). Having proposed that instruction, Saab waived any argument that the District Court should have instructed the jury to base its finding on

---

[12] To the extent that Saab's challenge could be construed as an argument that the District Court should have dismissed Count Three as time-barred, Fed. R. Crim. P. 12(b)(3)(B)(v), any such argument is likewise waived, because Saab did not "did not raise this claim 'prior to trial, as unambiguously required by the law of this Circuit,' and . . . has shown no cause for failing to timely do so." *United States v. Pastore*, No. 18-2482, 2022 WL 2068434, at *3 (2d Cir. June 8, 2022) (citing *United States v. Spero*, 331 F.3d 57, 61-62 (2d Cir. 2003)).

29

conduct *after December 17, 2004*—a date that nowhere appears in Saab's requests to charge or other submissions below. *See United States v. Panebianco*, 543 F.2d 447, 453-54 (2d Cir. 1976) (holding that defendant's *ex post facto*/retroactivity claim was waived because defendant's proposed jury instruction did not include the relevant date, and "this omission precluded [defendant] from raising such a retroactivity claim at sentencing"); *see also Wells*, 519 U.S. at 488; *Shea*, 2024 WL 2130874, at *2; *Gill*, 674 F. App'x at 58; *Binday*, 804 F.3d at 582-83; *see generally United States v. Torres*, 901 F.2d 205, 228 (2d Cir. 1990) ("[I]t is established that an *ex post facto* challenge to a jury instruction can be waived."), *overruled on other grounds as recognized by United States v. Marcus*, 628 F.3d 36 (2d Cir. 2010).

It bears noting that Saab waived his challenges to the District Court's jury instruction irrespective of whether his positions and proposals below were "tactical" decisions. *See Shea*, 2024 WL 2130874, at *2 ("[W]hile [defendant] argues that we should not find waiver because his counsel's joint submission of the charge was not a 'tactical' decision, 'a tactical benefit [is not] a prerequisite to identifying waiver.'" (quoting *United States v. Spruill*, 808 F.3d 585, 599 (2d Cir. 2015))). Indeed, this Court has not scrutinized the motivations underlying a defendant's proposed jury instructions before concluding that the defendant could not challenge instructions he invited. *See, e.g.*, *Binday*, 804 F.3d at 582-83; *Giovanelli*, 464 F.3d at 351 (waiver based on "invitation" of the instructional error, without analysis of tactics); *United States v. Young*, 745 F.2d 733, 752 (2d Cir. 1984) ("[The defendant] cannot now complain of this charge . . . because he requested

30

it, and not even the plain error doctrine permits rever-sal on the ground that the trial court granted a defend-ant's request to charge."); *Gill*, 674 F. App'x at 58-59 (finding waiver where defendant jointly proposed in-struction, without analyzing underlying tactical justi-fication for proposal).

## C. In Any Event, Saab Has Not Established that the District Court Plainly Erred in Instructing the Jury on Section 3286(b)

Even if Saab's challenges to the District Court's jury instruction on Section 3286(b) were not waived, Saab has not established plain error. (*See* Br. 3, 30-33 (arguing that the plain-error standard applies)). The statute of limitations in Section 3286(b) was properly applied in this case because at the time that Congress extended the limitations period applicable to Saab's of-fense in March 2006, the previously applicable limita-tions period had not expired. Nor can Saab establish plain error in the District Court's failure to instruct the jury on Section 2339D's date of enactment as part of the Section 3286(b) jury instruction.

### 1. Applicable Law

#### a. 18 U.S.C. § 3286

Most federal noncapital offenses carry a five-year statute of limitations. *See* 18 U.S.C. § 3282(a). Certain terrorism offenses, however, are subject to an ex-tended statute of limitations. 18 U.S.C. § 3286. In Oc-tober 2001, in the wake of the terrorist attacks of Sep-tember 11, 2001, Congress amended Section 3286 to, among other things, eliminate the statute of

31

limitations "for any offense listed in section 2332b(g)(5)(B), if the commission of such offense resulted in, or created a for[e]seeable risk of, death or serious bodily injury to another person." USA PATRIOT Act of 2001, Pub. L. No. 107-56, § 809(a), 115 Stat. 272. In thus amending Section 3286, Congress expressly stated that the amendments had retroactive effect: "The amendments made by this section shall apply to the prosecution of any offense committed before, on, or after the date of the enactment of this section." *Id.* § 809(b), 115 Stat. 272.

As amended, Section 3286 provides as follows, in relevant part:

> (b) No limitation.—Notwithstanding any other law, an indictment may be found or an information instituted at any time without limitation for any offense listed in section 2332b(g)(5)(B), if the commission of such offense resulted in, or created a for[e]seeable risk of, death or serious bodily injury to another person.

18 U.S.C. § 3286(b).

### b.    18 U.S.C. § 2339D

Section 2339D criminalizes knowing receipt of military-type training from or on behalf of a designated terrorist organization. 18 U.S.C. § 2339D(a). This statute was enacted on December 17, 2004, as part of the Intelligence Reform and Terrorism Prevention Act of 2004, Pub. L. No. 108-458, § 6602, 118 Stat. 3638.

32

Section 2339D previously carried a five-year statute of limitations. *See* 18 U.S.C. § 3282(a). On March 9, 2006, however, Congress added Section 2339D to the list of offenses in Section 2332b(g)(5)(B). USA PATRIOT Improvement and Reauthorization Act of 2005, Pub. L. No. 109-177, § 112, 120 Stat. 192 (2006) (the "2006 Statute"). As a result, Section 2339D became subject to the extended statute of limitations set forth in 18 U.S.C. § 3286.

### c.    The *Ex Post Facto* Clause and Retroactivity under *Landgraf*

The *Ex Post Facto* Clause provides that "[n]o . . . ex post facto Law shall be passed." U.S. Const. art. I, § 9, cl. 3. The Clause prohibits Congress from passing a law that "(1) makes an act a crime that was legal when committed; (2) makes a crime greater than it was when it was committed; (3) increases the punishment for a crime after it has been committed; or (4) deprives the accused of a legal defense that was available at the time the crime was committed." *United States v. Harris*, 79 F.3d 223, 228 (2d Cir. 1996) (quoting *Collins v. Youngblood*, 497 U.S. 37, 41-42 (1990)).

In *Landgraf v. USI Film Products*, 511 U.S. 244 (1994), the Supreme Court set forth a two-part framework for determining whether a statute may be applied retroactively. At the first step, "if Congress expressly prescribed that a statute applies retroactively to antecedent conduct, the inquiry ends and the court enforces the statute as it is written, save for constitutional concerns." *United States v. Weingarten*, 865 F.3d 48, 54-55 (2d Cir. 2017). If, however, the "statute is

33

ambiguous or contains no express command regarding retroactivity," then the court must turn to the second step, where "a reviewing court must determine whether applying the statute to antecedent conduct would create presumptively impermissible retroactive effects." *Id.* at 55. "If it would, then the court shall not apply the statute retroactively absent clear congressional intent to the contrary." *Id.* "If it would not, then the court shall apply the statute to antecedent conduct." *Id.*

As the Supreme Court explained in *Landgraf*, "[e]ven absent specific legislative authorization," applying a statute to pre-enactment conduct "is unquestionably proper in many situations." 511 U.S. at 273. There are no impermissible retroactive effects merely because the statute "is applied in a case arising from conduct antedating the statute's enactment, or upsets expectations based in prior law." *Id.* at 269. Instead, the question is whether the statute "would impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." *Id.* at 280. "[T]he fact that a new procedural rule was instituted after the conduct giving rise to the suit does not make application of the rule at trial retroactive," because parties have "diminished reliance interests in matters of procedure" and "[b]ecause rules of procedure regulate secondary rather than primary conduct." *Id.* at 275.

34

### d. Plain-Error Review

Where a defendant fails to raise a challenge in the district court, this Court's review is for plain error. *United States v. Hendricks*, 921 F.3d 320, 326 (2d Cir. 2019). Under the plain-error standard, a defendant must demonstrate that: "(1) there is an error; (2) the error is clear or obvious, rather than subject to reasonable dispute; (3) the error affected the appellant's substantial rights, which in the ordinary case means it affected the outcome of the district court proceedings; and (4) the error seriously affects the fairness, integrity or public reputation of judicial proceedings." *United States v. Marcus*, 560 U.S. 258, 262 (2010). "[R]eversal for plain error should be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Villafuerte*, 502 F.3d 204, 209 (2d Cir. 2007); *see also Puckett v. United States*, 556 U.S. 129, 135 (2009) ("Meeting all four prongs is difficult, as it should be."). The burden to establish plain error is on the appellant. *United States v. Dussard*, 967 F.3d 149, 156 (2d Cir. 2020).

## 2. Discussion

### a. Saab Has Not Established that the District Court Plainly Erred by Instructing the Jury on Section 3286(b)

In contending that the District Court should not have instructed the jury on Section 3286(b), Saab invokes both the *Ex Post Facto* Clause and the *Landgraf* framework. (*See, e.g.*, Br. 23, 26-27, 30). Even if Saab's challenge were not waived, Saab has not established error, much less plain error, under either framework.

35

As this Court has recognized, "[t]he long-standing rule in this circuit is that Congress has the power to extend the period of limitations without running afoul of the *ex post facto* clause, provided the original period has not already run." *United States v. Weinlein*, 109 F.4th 91, 100 (2d Cir. 2024); *see also Stogner v. California*, 539 U.S. 607, 632 (2003) (holding that the *Ex Post Facto* Clause "does not prevent the State from extending time limits for . . . prosecutions not yet time barred"). As this Court explained nearly a century ago, while it is "unfair and dishonest" for the Government to "assure a man that he has become safe from its pursuit" but then "withdraw its assurance," it is permissible to extend a statute of limitations "while the chase is on." *Falter v. United States*, 23 F.2d 420, 426 (2d Cir. 1928) (L. Hand, J.). "Since that decision, the federal appellate courts have gone on to hold—with near uniformity—that Congress may retrospectively extend a still-open criminal statute of limitations without offending the Constitution." *Weinlein*, 109 F.4th at 100. Because there is no dispute that the five-year statute of limitations previously applicable to Saab's offense (committed between 1996 and 2005) had not expired in 2006 when Congress extended the statute of limitations, this Court's binding precedent forecloses any argument that the *Ex Post Facto* Clause was violated.[13]

_____

[13]  Saab points out that the "aggravating factor" required to trigger the extended limitations period in Section 3286(b)—that the conduct created a foreseeable risk of death or serious injury—"was not a statutory consideration at the time Mr. Saab committed his

36

Saab's *Landgraf* argument fares no better, as "*Landgraf* and the *Ex Post Facto* Clause are informed by the same retroactivity concerns." *Cruz v. Maypa*, 773 F.3d 138, 145 (4th Cir. 2014); *see Landgraf*, 511 U.S. at 266 (citing the *Ex Post Facto* Clause as an "expression" of "the antiretroactivity principle" it was applying).

At step one of the *Landgraf* analysis, the question is "whether Congress has expressly prescribed the statute's proper reach." *Fernandez-Vargas v. Gonzales*, 548 U.S. 30, 37 (2006). As the Supreme Court has directed, "in the absence of language as helpful as that we try to draw a comparably firm conclusion about the temporal reach specifically intended by applying [the] normal rules of construction." *Id*. The Government agrees that "[t]here is nothing within [the] statutory language" of the 2006 Statute—which added Section 2339D to the list of offenses subject to the statute of limitations in Section 3286—"which *expressly* provides for retroactive application." (Br. 28 (emphasis added)). But among the "normal rules of construction," *Fernandez-Vargas*, 548 U.S. at 37, is the assumption that "Congress is aware of existing law when it passes legislation." *Miles v. Apex Marine Corp*., 498 U.S. 19, 32

─────────

alleged offense." (Br. 30). This observation is irrelevant: If "Congress has the power to extend the period of limitations without running afoul of the *ex post facto* clause, provided the original period has not already run," *Weinlein*, 109 F.4th at 100, then, *ipso facto*, it has the power to so extend it in a narrower set of cases where a particular aggravating factor is present.

37

(1990). This Court thus "must take into account [the] contemporary legal context," *Cannon v. Univ. of Chicago*, 441 U.S. 677, 698-99 (1979), at the time the 2006 Statute was passed.

Here, in adding Section 2339D to the relevant list of offenses in 2006 and thereby subjecting it to Section 3286, Congress was aware that it had previously expressly stated, in 2001, that the extended statute of limitations in Section 3286 applied retroactively. *See* Pub. L. No. 107-56, § 809(b), 115 Stat. 272 ("The amendments made by this section shall apply to the prosecution of any offense committed before, on, or after the date of the enactment of this section."). Thus, even in the absence of an express statement in 2006, Congress can be presumed to have intended to extend the statute of limitations applicable to Section 2339D retroactively, as it had expressly said it was doing with respect to other designated offenses in 2001. *Cf. Albernaz v. United States*, 450 U.S. 333, 341-42 (1981) ("[I]f anything is to be assumed from the congressional silence . . . , it is that Congress was aware of the *Blockburger* rule and legislated with it in mind."). At the very least, Saab has not established that any error at *Landgraf*'s step one was "clear or obvious, rather than subject to reasonable dispute," *Marcus*, 560 U.S. at 262; *see United States v. Whab*, 355 F.3d 155, 158 (2d Cir. 2004) ("For an error to be plain, it must, at a minimum, be clear under current law. We typically will not find such error where the operative legal question is unsettled, including where there is no binding precedent from the Supreme Court or this Court.").

38

Even if this Court were to conclude that it is clear or obvious that the "statute is ambiguous or contains no express command regarding retroactivity," this Court must turn to the second step of the *Landgraf* analysis, where it "must determine whether applying the statute to antecedent conduct would create presumptively impermissible retroactive effects." *Weingarten*, 865 F.3d at 55. Here, the clear weight of authority dictates that applying the extended statute of limitations in Section 3286(b) to Saab's antecedent conduct would not create any presumptively impermissible retroactive effects, because the statute of limitations was extended well before the previous limitations period to charge Saab had expired.

In *Vernon v. Cassadaga Valley Cent. School Dist.*, 49 F.3d 886 (2d Cir. 1995), this Court considered a new statute of limitations that shortened the time to file certain discrimination claims, and held that applying the new statute in a case "filed after its enactment, but arising out of events that predate its enactment," was not impermissibly retroactive under *Landgraf. Id.* at 889-90. As the Court explained, "[t]he conduct to which the statute of limitations applies is not the primary conduct of the defendants, the alleged discrimination, but is instead the secondary conduct of the plaintiffs, the filing of their suit." *Id.* at 890. The extended statute of limitations in Section 3286(b) likewise applies only to the secondary conduct of filing a criminal case; it does not apply to the primary conduct of Saab's activities with Hizballah by, for example, modifying the elements of an offense to criminalize conduct that previously had not constituted a crime. *See id.* at 891 ("*Landgraf* and other cases countenance treating

39

statutes of limitations differently from statutory provisions that affect substantive rights."). Thus, like the new statute in *Vernon*, the extended statute of limitations "as applied here impaired no rights possessed by either party, increased neither party's liability, nor imposed any new duties with respect to past transactions." *Id.* at 890.

To be sure, this Court has held that "the resurrection of *previously time-barred claims* has an impermissible retroactive effect." *In re Enter. Mort. Acceptance Co. Sec. Litig. ("Enterprise")*, 391 F.3d 401, 410 (2d Cir. 2004) (emphasis added). But that principle has no application here because the statute of limitations for Saab's Section 2339D offense had not expired at the time that the limitations period was extended in 2006. Thus, unlike the defendants in *Enterprise*, who were "stripp[ed] . . . of a complete affirmative defense they previously possessed" when expired claims were resurrected, *id.*, Saab never possessed that complete defense in first place.[14] As this Court has noted, any argument that "the logic of *Enterprise* extends to criminal cases where the defendant's statute of limitations

————

[14] Saab's invocation of the principle that "'[a] law that abolishes an affirmative defense' violates the Ex Post Facto Clause," (Br. 30 (quoting *Collins*, 497 U.S. at 49)), is inapposite for the same reason. *See Weinlein*, 109 F.4th at 100 ("The long-standing rule in this circuit is that Congress has the power to extend the period of limitations without running afoul of the *ex post facto* clause, provided the original period has not already run.").

40

defense had not vested when the limitations period was extended" runs headlong into "the vast weight of retroactivity decisions," which recognize that "revoking a vested statute of limitations defense is different from retroactively extending the filing period for a still-viable claim." *Weingarten*, 865 F.3d at 57 (collecting cases); *see also Weinlein*, 109 F.4th at 100. As the Tenth Circuit has explained:

> By extending the unexpired statute of limitations, Congress did not increase [defendant's] exposure to prosecution retroactively. It did not raise the penalty for the charged offense. It did not redefine the offense to make it easier to establish. It did not expose [defendant] to criminal prosecution anew. It merely altered the ongoing charging period for the conduct that had already exposed him to criminal prosecution. . . . A dead charge was not resurrected, and the underlying nature of [defendant's] potential criminal liability remained the same.

*United States v. Piette*, 45 F.4th 1142, 1161-62 (10th Cir. 2022).

Saab argues that a retroactive application of the 2006 Statute "would unquestionably impair vested rights" because, in addition to extending the statute of limitations applicable to Section 2339D, the 2006 Statute's placement of Section 2339D within the list of offenses in Section 2332b(g)(5)(B) served to "deprive a defendant of his presumptive, statutory right to bail"; subject him to an increased sentence . . . while also

41

ratcheting up his guidelines; and "qualify[ ] his conduct as a predicate offense under RICO." (Br. 29-30; *see also* Br. 25-26). But none of these consequences is what Saab challenges here: the application of the extended statute of limitations. (Br. 25-31).[15] The relevant inquiry under the second step of the *Landgraf* analysis is "'whether applying the statute *to the person objecting* would have a retroactive consequence in the disfavored sense of affecting substantive rights, liabilities, or duties on the basis of conduct arising before its enactment.'" *Olivieri v. Stifel, Nicolaus & Co., Inc.*, 112 F.4th 74, 91 (2d Cir. 2024) (emphasis added) (quoting *Fernandez-Vargas*, 548 U.S. at 37). Saab cannot demonstrate that the District Court erred, let alone plainly erred, by applying the extended statute of limitations in his case by arguing about hypothetical other defendants with unrelated other vested rights that may have been impaired if the 2006 Statute had been applied retroactively in their cases. *See, e.g.*, *Baldwin v. City of Greensboro*, 714 F.3d 828, 836 (4th Cir. 2013) ("[The] analysis [under the second step] is narrow, for it asks *not* whether the statute may possibly have an impermissible retroactive effect in any case, but specifically whether applying the statute *to the person objecting* would have a retroactive consequence in the disfavored sense." (emphasis in original)); *see also Vernon*, 49 F.3d at 890 ("The statute *as applied here* impaired no rights possessed by either party, increased neither party's liability, nor imposed

––––––––––

[15] The Government addresses Saab's separate sentencing challenge in Point III, *infra*.

42

any new duties with respect to past transactions." (emphasis added)).

In sum, at *Landgraf*'s step two, because the statute of limitations applicable to Count Three had not yet expired when Congress extended the limitations period in 2006, applying the extended statute of limitations in Saab's case did not create any impermissible retroactive effects. Therefore, the District Court properly instructed the jury on Section 3286(b). *See Weingarten*, 865 F.3d at 55 ("If [a statute] would not [create impermissible retroactive effects], then the court shall apply the statute to antecedent conduct.").

At the very least, Saab has not established that any error at *Landgraf*'s step two was "clear or obvious, rather than subject to reasonable dispute," *Marcus*, 560 U.S. at 262. Saab has not cited any case in which any court has held that applying a statute of limitations that was extended prior to the expiration of the previous limitations period to antecedent conduct created impermissibly retroactive effects. To the contrary, as this Court has noted, "the vast weight of retroactivity decisions" recognize that "revoking a vested statute of limitations defense is different from retroactively extending the filing period for a still-viable claim." *Weingarten*, 865 F.3d at 57 (collecting cases). Nor has Saab cited any case in which any court conducted a *Landgraf* analysis based on consideration of retroactive consequences other than the specific consequence to which the defendant was objecting. *See Whab*, 355 F.3d at 158 ("For an error to be plain, it must, at a minimum, be clear under current law.").

43

### b. Saab Has Not Established that the District Court Plainly Erred by Not Instructing the Jury on Section 2339D's Enactment Date in the Section 3286(b) Instruction

Saab argues that the District Court should have instructed the jury to base any finding under Section 3286(b) on conduct postdating Section 2339D's date of enactment. (Br. 31-33). Even if this argument were not waived, Saab has not established plain error. Saab has not cited any binding authority requiring a district court to include the date of enactment of the relevant statute as part of its instruction on a defendant's statute-of-limitations defense. (*See* Br. 31-33). In absence of such authority, Saab cannot establish that the alleged error is plain. *See United States v. Hunt*, 82 F.4th 129, 139 (2d Cir. 2023) (this Court "typically will not find such [plain] error where the operative legal question is unsettled, including where there is no binding precedent from the Supreme Court or this Court"); *United States v. Weintraub*, 273 F.3d 139, 152 (2d Cir. 2001) ("Without a prior decision from this court or the Supreme Court mandating the jury instruction that [defendant], for the first time on appeal, says should have been given, we could not find any such error to be plain, if error it was.").

Saab also has not satisfied the remaining requirements of plain-error relief. As discussed above, *see* Point I.A.2, *supra*, the Government presented overwhelming evidence that Saab's receipt of military-type training from Hizballah in 2005 created a foreseeable risk of death or serious bodily injury. In particular,

44

through the spring of 2005, Saab continued to participate in Hizballah-directed surveillance of landmarks and infrastructure in New York City and Istanbul to "facilitate Hezbollah's bombing operations against those targets." (A-252; *see, e.g.*, GX 125 (surveillance photo of Statue of Liberty from May 2005, recovered from Saab's hard drive); *see also* GX 114, 115, 121, 355; A-316-22). Saab also participated in extensive explosives training, which continued until April 2005 and during which Saab built and tested IEDs, including a fully operable "sticky bomb" that Saab detonated, knowing that Hizballah had a history of using IEDs to carry out "particularly devastating" attacks. (A-266-67, 314). On this record, Saab has failed to demonstrate a reasonable probability that the alleged error in failing to instruct the jury that it must base its Section 3286(b) finding on conduct postdating December 17, 2004, affected the outcome of his trial. *See Marcus*, 628 F.3d at 42 (explaining that showing an effect on a defendant's "substantial rights" requires a showing that there "is a reasonable probability that the error affected the outcome of the trial"). For the same reason, "there is no basis for concluding that the error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings," and "[n]o miscarriage of justice will result here" if this Court declines to notice any error. *Johnson v. United States*, 520 U.S. 461, 470 (1997).

45

## POINT II

**Saab Has Not Established that the District Court Plainly Erred by Failing to Instruct the Jury that a Guilty Verdict on Count Three Could Not Rest Exclusively on Pre-Enactment Conduct**

### A.   Applicable Law

Under the Due Process Clause, where a defendant's conduct began before the enactment of the relevant criminal statute and continued thereafter, a conviction may not rest solely on the basis of conduct that was not criminal when the defendant engaged in that conduct. *Marcus*, 560 U.S. at 263-64. A district court may "minimize[ ], if not eliminate[ ], this risk by giving the jury a proper limiting instruction." *Id.* at 263-64. Where the district court does not issue such an instruction and the defendant fails to object, this Court reviews the defendant's due process claim for plain error. *Id.* at 262-66.

### B.   Discussion

Saab argues that the District Court committed plain error in failing to instruct the jury that it could not find him guilty on Count Three based exclusively on conduct that predated December 17, 2004, when Section 2339D was enacted. (Br. 36-42). The Government agrees that the District Court's failure to issue such an instruction was error, and that the error was clear or obvious. However, Saab has not established that the error affected his substantial rights or seriously affected the fairness, integrity or public reputation of judicial proceedings. *Marcus*, 560 U.S. at 262.

46

In light of the overwhelming evidence of Saab's post-enactment criminal conduct presented at trial, there is no reasonable probability that the jury would not have convicted Saab absent the error. *See Marcus*, 628 F.3d at 42 ("[T]o have impacted [defendant's] substantial rights and the fairness, integrity or public reputation of the judicial proceedings, the overall effect of the due process error must have been sufficiently great such that there is a reasonable probability that the jury would not have convicted him absent the error.").

*Marcus*, the sole authority that Saab invokes, (Br. 36-42), defeats Saab's claim of plain error. In *Marcus*, the defendant was convicted of forced labor and sex trafficking charges based on conduct between January 1999 and October 2001. 560 U.S. at 260. On appeal, the defendant "pointed out for the first time that the statutes he violated . . . did not become law until October 28, 2000." *Id.* This Court ultimately affirmed the defendant's forced labor conviction, holding that there was no reasonable probability that the jury would have acquitted the defendant but for the error. *Marcus*, 628 F.3d at 42-43.[16] In reaching this

---

[16] This Court initially vacated the conviction, holding that a retrial was "necessary whenever there is any possibility, no matter how unlikely, that the jury could have convicted based exclusively on pre-enactment conduct." *United States v. Marcus*, 538 F.3d 97, 102 (2d Cir. 2008), *rev'd*, 560 U.S. 258 (2010). The Supreme Court reversed and remanded, holding that that standard of review was inconsistent with the

47

determination, this Court relied on two factors: *first*, that "the government presented post-enactment evidence sufficient to satisfy the elements of the forced labor statute," and *second*, that there was "no reasoned basis to differentiate between [defendant's] pre- and post-enactment conduct." *Id.* By contrast, this Court vacated the defendant's sex trafficking conviction, as to which the Government had conceded plain error, because "the conduct supporting the sex trafficking charge differed materially before and after [the enactment date]." *Id.* at 44.

Both factors on which this Court relied to affirm the forced labor conviction in *Marcus* are present in this case. There is no dispute that "the government presented post-enactment evidence sufficient to satisfy the elements of" Section 2339D. *Id.* at 42. As discussed above, *see* Point I.A.2, *supra*, the evidence at trial overwhelmingly established that Saab participated in Hizballah surveillance training in Istanbul and New York City, and in explosives training in Lebanon, well into the spring of 2005—several months after Section 2339D was enacted in December 2004. (A-252-53, 266-68, 972-75). Saab does not dispute that the post-enactment evidence was sufficient to meet the elements of Section 2339D. (*See* Br. 41).

There is also "no reasoned basis to differentiate between [Saab's] pre- and post-enactment conduct." *Marcus*, 628 F.3d at 42-43. Saab did not take on any new

---

Supreme Court's plain-error precedent. *Marcus*, 560 U.S. at 260.

48

role for Hizballah or engage in any new types of training after Section 2339D was enacted in December 2004. Rather, the evidence showed that Saab's course of conduct in receiving military-type training from Hizballah remained materially the same before and after Section 2339D was enacted. For example, Saab's surveillance of New York City and Istanbul in 2005, (A-252-53, 316-17, 323), was the same type of surveillance that Saab had conducted for Hizballah in New York City in 2003, (*see* A-263-64 (Saab received surveillance training starting in "approximately 2003"); GX 50 (surveillance photograph from Saab's hard drive of Lincoln Tunnel in 2003)). Similarly, Saab's explosives training in Lebanon in 2005, (A-266-68, 389-90, 973-75), was the same type of explosives training, albeit more extensive, that Saab had received starting in "approximately 2003," (A-264). In sum, "no transformative event occurred prior to [the enactment date] that would alter a reasonable jury's perception of the nature of [the defendant's] involvement." *United States v. Munoz-Franco*, 487 F.3d 25, 57-58 (1st Cir. 2007). Rather, as in *Marcus*, the conduct here remained "essentially the same." 628 F.3d at 43; *see id.* (explaining that defendant's pre- and post-enactment conduct was "essentially the same" and that, if anything, defendant's use of force against his victim "*increased* post-enactment" (emphasis in original)).

Moreover, the evidence at trial of Saab's post-enactment conduct was stronger and more corroborated. While much of Saab's pre-enactment conduct was presented largely through Saab's own admissions, the Government introduced compelling evidence corroborating Saab's admissions with respect to his post-

49

enactment conduct, particularly his 2005 explosives training in Lebanon. To corroborate Saab's admissions regarding the 2005 explosives training, the Government introduced Saab's contemporaneous admission to Agent McHugh that he had been "detained by the Turkish authorities based on the [detection] of explosive residue," (A-268, 972-976); a photograph recovered from Saab's hard drive depicting his visit to a Hizballah blast site in Beirut in 2005, (A-401, GX 220); and Saab's own sketches of three explosive devices he had learned to construct during the explosives training, (GX 301, 302, 303; A-332-38, 834-35). The Government also introduced evidence corroborating Saab's admissions regarding his Hizballah-directed surveillance activities in 2005, including photographs recovered from Saab's hard drive of locations in Istanbul, (GX 115-123) and New York City, (GX 124-27); a marked-up "Istanbul City Guide" recovered from Saab's residence, (GX 355); and Saab's passport showing his travel to Turkey, (GX 356 at 6).[17] On this record, where Saab engaged in an undifferentiated course of conduct pre- and post-enactment, and the evidence of his post-enactment conduct was stronger and more corroborated, there is no reasonable probability that the jury would have acquitted Saab but for the District Court's error. *Marcus*, 628 F.3d at 42.

───────────

[17] Saab's pre-enactment surveillance activities were also corroborated in part by photographs and videos recovered from Saab's electronic devices. (*See, e.g.*, GX 50).

50

Saab's argument that "the evidence in this case is more analogous to the sex trafficking count vacated by this Court in *Marcus*," (Br. 41), fails. In vacating the sex trafficking conviction in *Marcus*, this Court explained that the relevant statute proscribed several distinct trafficking acts—including recruiting, enticing, harboring, or transporting a victim. 628 F.3d at 43-44 & n.8. In *Marcus*, the evidence showed that the defendant had fully completed three of the four relevant trafficking acts—recruiting, enticing, and transporting his victim—before the statute was enacted; only his harboring of the victim continued post-enactment. *Id.* at 44. On those facts, the Government conceded plain error, and this Court vacated the sex trafficking conviction. *Id.* at 43-44.

No similar facts are present here. Section 2339D proscribes a single type of conduct, receiving military-type training from a foreign terrorist organization, which Saab perpetrated in materially the same way both pre- and post-enactment—just like the defendant in *Marcus* perpetrated his forced labor conduct in "essentially the same" way over time. *Id.* While Saab seeks to frame his conduct as a series of "separate and discrete training sessions . . . occurring between 1996 and the spring of 2005," (Br. 41), the forced labor conduct in *Marcus* likewise consisted of a series of discrete events over time. *See* 628 F.3d at 39-40, 42-43. Like Marcus, Saab "offers no explanation for how his pre-enactment conduct differed from his post-enactment conduct in a manner that would lead [this Court] to conclude that there is a reasonable probability that the

51

jury would not have convicted him absent the due process error." *Id.* at 43.[18]

Saab's effort to establish plain error based on the number of months of pre-enactment versus post-enactment conduct, (Br. 39-40), also fails.[19] This Court in *Marcus* did not rely on the length of the defendant's pre-enactment conduct in conducting its plain-error analysis. *See* 628 F.3d at 42-44. To the contrary, this Court rejected the defendant's argument that "the proceedings were swamped by highly prejudicial evidence —spanning 22 months—that, although charged as criminal, violated no law at the time." *Id.* at 43. As this Court explained, "[t]he Government presented substantial evidence of [the defendant's] post-enactment conduct, and nothing about the nature or quantity of

_____

[18] Without citing any authority addressing the issue, Saab contends that Section 2339D is not a "continuing offense." (Br. 41 n.6). In *Marcus*, this Court declined to decide "whether forced labor constitutes a continuing offense," explaining that "[e]ven assuming it does not, a new trial is not warranted because neither the third nor fourth requirements of the plain error standard are satisfied." *Marcus*, 628 F.3d at 43 n.7. This Court should do the same here.

[19] Saab misstates the record by claiming that "[t]he Government introduced evidence that Mr. Saab attended . . . training sessions 20 to 30 times between 2000 and 2004." (Br. 40 (citing A-263)). Agent Cipriano testified only that Saab *met* with one of his Hizballah handers "20 to 30 times" during that period. (A-263).

52

the evidence of [the defendant's] pre-enactment con-
duct leads us to conclude that it is reasonably probable
that the jury would have acquitted [the defendant] but
for the evidence of [the defendant's] pre-enactment
conduct." *Id.* The same holds true here. *See United
States v. Thornburgh*, 645 F.3d 1197, 1211-12 (10th
Cir. 2011) (finding no plain error and rejecting argu-
ment regarding "volume and frequency" of pre-enact-
ment conduct, as there was "no reason to presume that
the jury differentiated between" pre- and post-enact-
ment conduct "and convicted [defendant] on the basis
of the volume of pre-enactment conduct only"); *United
States v. Fishman*, 645 F.3d 1175, 1195-96 (10th Cir.
2011) (finding no plain error because Government of-
fered "substantial post-enactment evidence" and there
was no basis to differentiate between pre- and post-en-
actment conduct).[20]

---------

[20] Saab misstates the record by claiming that, in
summation, "prosecutors *expressly* told the jury that
they could convict Mr. Saab based upon events that
took place prior to December of 2004." (Br. 41 (empha-
sis in original) (citing A-1211)). In the portion of the
summation that Saab cites, the Government refer-
enced weapons and firearms training without provid-
ing a date range, (A-1211), and, as discussed, the evi-
dence made clear that Saab received such training
both before and after December 2004.

53

**POINT III**

**Saab Has Not Demonstrated that the District Court Plainly Erred by Applying the Guidelines Terrorism Enhancement**

Saab argues that the District Court plainly erred in applying Section 3A1.4 of the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") (the "Terrorism Enhancement") because his offense of conviction in Count Three did not become a "federal crime of terrorism" within the meaning of Section 3A1.4 until March 2006, after his offense conduct had terminated. (Br. 42-45). Because the record makes clear that Saab's offense "was intended to promote" a federal crime of terrorism, U.S.S.G. § 3A1.4(a), there is an alternative basis to apply the Terrorism Enhancement, and Saab cannot demonstrate plain error.

**A. Applicable Law**

**1. The Terrorism Enhancement**

Section 3A1.4 of the Guidelines provides that "[i]f the offense is a felony that involved, or was intended to promote, a federal crime of terrorism," the offense level will be increased by 12 levels (and be no lower than level 32), and the defendant's criminal history category shall be Category VI. U.S.S.G. § 3A1.4. The commentary to Section 3A1.4 provides that "'federal crime of terrorism' has the meaning given that term in 18 U.S.C. § 2332b(g)(5)." *Id.* § 3A1.4, comment. (n.1). Section 2332b(g)(5), in turn, defines "[f]ederal crime of terrorism" to mean an offense that (A) "is calculated to influence or affect the conduct of government by

54

intimidation or coercion, or to retaliate against government conduct," and (B) is a violation of one of the enumerated statutes. 18 U.S.C. § 2332b(g)(5). Saab's statute of conviction in Count Three, 18 U.S.C. § 2339D, was added to the list of enumerated statutes in Section 2332b(g)(5) in March 2006. Pub. L. No. 109-177, § 112, 120 Stat. 192.

Section 3A1.4 thus provides two independent grounds for application of the Terrorism Enhancement: the predicate felony offense "must either (1) 'involve' a federal crime of terrorism or (2) be 'intended to promote' a federal crime of terrorism." *United States v. Awan*, 607 F.3d 306, 313 (2d Cir. 2010); *see also id.* at 314 ("Because Section 3A1.4(a) is written as a disjunctive phrase and must be interpreted to avoid redundancy, the 'intended to promote' prong must be applicable in some circumstances in which the 'involved' prong is not, *i.e.*, where the defendant's offense or relevant conduct does not include a federal crime of terrorism."); *see also United States v. Stewart*, 590 F.3d 93, 137-38 (2d Cir. 2009) ("The enhancement is not limited ... to offenses that are themselves federal crimes of terrorism. By including the 'intended to promote' language, the drafters of the Guideline unambiguously cast a broader net.").

The "intended to promote" prong of Section 3A1.4 "applies where the defendant's offense is intended to encourage, further, or bring about a federal crime of terrorism, even though the defendant's own crime of conviction or relevant conduct may not include a federal crime of terrorism." *Awan*, 607 F.3d at 314. As a result, for the "intended to promote" prong, "the

55

defendant himself does not have to commit an offense listed in § 2332b(g)(5), and the defendant's offense need not itself be 'calculated [to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct]' as described in § 2332b(g)(5)(A)." *Id.*

## 2. Standard of Review

A claim of Guidelines-calculation error raised for the first time on appeal is subject to "plain-error review." *United States v. Gates*, 84 F.4th 496, 503 (2d Cir. 2023). "[W]hen a defendant could have received exactly the same sentence in the absence of the alleged error, [the court] cannot say that its occurrence affected defendant's substantial rights resulting in a manifest injustice." *United States v. Diaz*, 176 F.3d 52, 118 (2d Cir. 1999); *cf. United States v. Jass*, 569 F.3d 47, 68 (2d Cir. 2009) ("Where we identify procedural error in a sentence, but the record indicates clearly that the district court would have imposed the same sentence in any event, the error may be deemed harmless, avoiding the need to vacate the sentence and to remand the case for resentencing."). This Court is "free to affirm an appealed decision on any ground which finds support in the record, regardless of the ground upon which the trial court relied." *United States v. Barker*, 723 F.3d 315, 319 (2d Cir. 2013).

## B. Relevant Facts

At sentencing, Judge Gardephe applied the Terrorism Enhancement based on his conclusion that Saab's offense "involved" a federal crime of terrorism. (A-

1596).[21] In particular, Judge Gardephe determined that Section 2339D is one of the enumerated statues under Section 2332b(g)(5)(B), and that Saab's offense was "calculated to influence or affect the conduct of government by intimidation or coercion, or to retaliate against government conduct." (A-1593). With respect to the latter finding, Judge Gardephe explained that "Saab does not and cannot reasonably dispute that Hizballah's objective is to influence governments through violence." (A-1593-94). Judge Gardephe cited evidence at trial demonstrating that "Hizballah is a militant organization dedicated to the destruction of Israel and dedicated to opposing the United States and western powers," and that "Saab's military training was obviously directed towards furthering Hizballah's ultimate goals, which include, among other things, ending Israel's occupation of Southern Lebanon through violent means." (A-1594-95). Judge Gardephe highlighted several actions that Saab took in furtherance of Hizballah's violent mission, including planting an IED to attack Israeli soldiers, conducting surveillance for Hizballah, attempting to assassinate an Israeli spy, and receiving "military explosives training." (A-1595-96).

––––––––––

[21] At sentencing, Saab objected to the application of the Terrorism Enhancement solely on the ground, which Saab does not press on appeal, that "mere military training is not intended to coerce a government or intimidate a civilian population." (A-1594). Saab acknowledges that the applicable standard of review for his claim on appeal is plain error. (Br. 44-45).

57

### C.  Discussion

Because Saab's offense, a violation of Section 2339D, was not added to the list of offenses in Section 2332b(g)(5) until March 2006, after Saab's offense conduct had terminated, the District Court erred in its determination that Saab's offense "involved" a federal crime of terrorism. (A-1596). However, the record and the District Court's findings at sentencing, which Saab does not challenge on appeal, demonstrate that Saab's offense was "intended to promote[ ] a federal crime of terrorism," U.S.S.G. § 3A1.4(a), which provides an independent basis to apply the Terrorism Enhancement.

The "intended to promote" prong of Section 3A1.4 "applies where the defendant's offense is intended to encourage, further, or bring about a federal crime of terrorism, even though the defendant's own crime of conviction or relevant conduct may not include a federal crime of terrorism." *Awan*, 607 F.3d at 314. Here, the record left no doubt that Hizballah is a foreign terrorist organization that committed numerous federal crimes of terrorism, including, as Judge Gardephe noted at sentencing, by "using explosives to conduct terrorist attacks and assassinations." (A-1582; *see also* PSR ¶¶ 19-22 (detailing Hizballah's history of deadly terrorist attacks)). Hizballah's long-running perpetration of deadly terror attacks implicated, at a minimum, 18 U.S.C. § 2332b (acts of terrorism transcending national boundaries); 18 U.S.C. § 2332f (bombing of public places and facilities), 18 U.S.C. § 2339A (providing material support to terrorists), and 18 U.S.C. § 2339B (providing material support to designated foreign terrorist organizations)—all of which were designated

58

offenses under Section 2332b(g)(5)(b) during the period of Saab's offense conduct. *See United States v. Graham*, 275 F.3d 490, 514 n.13 (6th Cir. 2001) (citing the version of 18 U.S.C. § 2332b(g)(5)(B) then in effect).

The record also firmly established that Saab's receipt of military-type training from Hizballah was "intended to encourage, further, or bring about" Hizballah's federal crimes of terrorism. *Awan*, 607 F.3d at 314. At sentencing, Judge Gardephe recounted the extensive evidence at trial of Saab's Hizballah-directed training activities that were intended to further Hizballah's terrorism, including Saab's "early surveillance of Israeli troops" with knowledge that his surveillance "would be used to facilitate Hizballah's IED operations against Israeli convoys in Yaroun, which [Saab] described as particularly devastating," (A-1596; *see also* A-1581); Saab's planting of an IED to attack an Israeli convoy in Lebanon, (A-1581); Saab's participation in an attempted assassination of an Israeli spy in 2003, (A-1585-86); Saab's surveillance of locations in Istanbul, New York City, Boston, and Washington, D.C., "to facilitate Hizballah's bombing operations against those targets" and to enable Hizballah to "cause the most destruction," (A-1618); and Saab's participation in a "field training exercise . . . where explosives were detonated," (A-1620). As Judge Gardephe found at sentencing, "Saab's military training was obviously directed towards furthering Hizballah's ultimate goals, which include, among other things, ending Israel's occupation of Southern Lebanon through violent means." (A-1595).

59

The record thus makes clear that Saab "could have" —indeed, would have—"received exactly the same sentence in the absence of the alleged error," *Diaz*, 176 F.3d at 118, based on the application of the "intended to promote" prong of the Terrorism Enhancement, which Saab does not address in his brief on appeal. Saab therefore has not met his burden of showing that the District Court's error affected his substantial rights or seriously affected the fairness, integrity, or public reputation of judicial proceedings. *Marcus*, 560 U.S. at 262; *Diaz*, 176 F.3d at 118; *see also United States v. Nunez*, 73 F. App'x 495, 496 (2d Cir. 2003) ("We find that the district court's decision to sentence [defendant] pursuant to U.S.S.G. § 2L1.2 instead of § 2X1.1 was not plain error because the adjusted offense level would have been the same under either provision."); *United States v. De*, 216 F.3d 1073 (2d Cir. 2000) ("[A] miscalculation or misinterpretation of the Guidelines does not constitute plain error where the defendant could have received exactly the same sentence in the absence of the alleged error."); *United States v. DiCostanzo*, 104 F.3d 349 (2d Cir. 1996) ("We see no plain error here in light of the fact that under the 1989 Guidelines, [defendant] could have received precisely the same sentence he received under the 1995 Guidelines."); *United States v. Arigbodi*, 924 F.2d 462, 464 (2d Cir. 1991) (per curiam) (holding that there is no plain error at sentencing when defendant "could have received exactly the same sentence in the absence of the alleged error"); *cf. United States v. Cramer*, 777 F.3d 597, 603 (2d Cir. 2015) ("An error in Guidelines calculation is harmless if correcting the error would

60

result in no change to the Guidelines offense level and sentencing range.").

## CONCLUSION

**The judgment of conviction should be affirmed.**

Dated:    New York, New York
           October 16, 2024

              Respectfully submitted,

              DAMIAN WILLIAMS,
              *United States Attorney for the*
              *Southern District of New York,*
              *Attorney for the United States*
                    *of America.*

SAM ADELSBERG,
JASON A. RICHMAN,
OLGA I. ZVEROVICH,
    *Assistant United States Attorneys,*
            *Of Counsel.*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limitation of the Federal Rules of Appellate Procedure and this Court's Local Rules. As measured by the word processing system used to prepare this brief, there are 13,956 words in this brief.

DAMIAN WILLIAMS,
*United States Attorney for the*
*Southern District of New York*

By: OLGA I. ZVEROVICH,
*Assistant United States Attorney*